Musa N. DANIEL and Arafa Daniel,
Appellants/Cross–Appellees,

v.

WILLIAM R. DRACH CO., INC.,
Appellee/Cross–Appellant.

Superior Court of Pennsylvania.

Argued June 24, 2003.
Filed May 10, 2004.

Robert J. Baccari, Feasterville, for Daniel.

Michael F. DeMarco, Philadelphia, for Drach Co.

1. Our decision here affirms the trial court's

Before: JOYCE, BENDER and BOWES, JJ.

BENDER, J.

¶ 1 Musa N. Daniel and Arafa Daniel (Appellants) appeal from the judgment entered in favor of William R. Drach Co., Inc. (Appellee) following a jury trial. Appellants claim that the trial court erred in admitting Appellee's exhibits, and in denying their motion for a new trial that claimed that the verdict was against the weight of the evidence and that Appellee's attorney made prejudicial statements in his closing argument. Appellee has filed a cross-appeal requesting that we affirm the trial court's decision. As we find no merit in Appellants' claims, we affirm the trial court's decision.

¶ 2 Appellants instituted the underlying action against Appellee for injuries sustained by Mr. Daniel following an alleged slip and fall that occurred on Appellee's loading dock. Mr. Daniel was a truck driver who was picking up 800 pound barrels of scrap metal from Appellee's premises at the time of the alleged accident. Appellants claim that Mr. Daniel slipped on a wet and greasy spot on the floor. Thus, Appellants' theory of liability was that Appellee negligently maintained its loading dock by allowing oil to build up on the floor, which when combined with water from either a leaking roof and/or a leaking heater caused the floor to become slippery, thereby causing Mr. Daniel to slip, fall, and injure himself.

¶ 3 At the conclusion of the trial, the jury found that Appellee was negligent, but that this negligence was not a substantial factor in causing Mr. Daniel's injury. Appellants filed a post-trial motion, which the trial court denied. They then filed the instant appeal, and Appellee cross-appealed.[1] Appellants have raised the following six questions for our review.

decision. Appellee requests that we only

[1] Whether the trial court abused its discretion by admitting defendant's exhibits into evidence ex parte, while counsel was absent from the courtroom?

[2] Whether the trial court abused its discretion by admitting defendant's exhibits into evidence after defendant rested and after the closing arguments?

[3] Whether the trial court erred in admitting defendant's exhibits into evidence without allowing counsel for plaintiffs to challenge the admission of the evidence?

[4] Whether the trial court abused its discretion by allowing defendant to move exhibits into evidence which contained inadmissible hearsay statements that the jury relied upon to reach their verdict in favor of defendant?

[5] Whether the trial court abused its discretion in denying plaintiff's motion for post-trial relief when the jury found that defendant's negligence was not a substantial factor in causing the harm despite the uncontradicted medical evidence and defendant's own admission in his opening that the fall caused plaintiff to suffer injuries?

[6] Whether the trial court abused its discretion in denying plaintiff's motion for post-trial relief when counsel for defendant made statements in his opening and closing arguments that were false, that stated his own personal beliefs and that were prejudicial to plaintiffs?

Brief for Appellants at 6.

■ ¶ 4 Appellants' first four questions challenge the trial court's admission of evidence after the close of Appellee's case. "It is well-settled that the decision of a trial judge to permit a party to reopen its case will not be reversed on appeal absent an abuse of discretion." *Beaumont v. ETL Services, Inc.*, 761 A.2d 166, 168

(Pa.Super.2000). Furthermore, "the admission or exclusion of evidence is a matter within the sound discretion of the trial court, which may only be reversed upon a showing of a manifest abuse of discretion." *Eichman v. McKeon*, 824 A.2d 305, 319 (Pa.Super.2003). We have reviewed the parties' briefs as well as the record on these issues, and we discern no abuse of discretion by the trial court. The trial court opinion, written by the Honorable Gary S. Glazer, adequately addresses the first four issues, and therefore, we adopt that portion of the opinion addressing these issues for purposes of further appellate review. Trial Court Opinion, 9/13/02, at 1–4.

■ ¶ 5 In the next two questions, Appellants claim that the trial court erred in denying their motion for post-trial relief. First they claim that the jury's verdict was against the weight of the evidence. "A new trial based on weight of the evidence issues will not be granted unless the verdict is so contrary to the evidence as to shock one's sense of justice; a mere conflict in testimony will not suffice as grounds for a new trial." *Nemirovsky v. Nemirovsky*, 776 A.2d 988, 993 (Pa.Super.2001). "Upon review, the test is not whether this Court would have reached the same result on the evidence presented, but, rather, after due consideration of the evidence found credible by the [jury], and viewing the evidence in the light most favorable to the verdict winner, whether the court could reasonably have reached its conclusion." *Turney Media Fuel, Inc. v. Toll Bros., Inc.*, 725 A.2d 836, 841 (Pa.Super.1999). "Our standard of review in denying a motion for a new trial is to decide whether the trial court committed an error of law which controlled the outcome of the case or committed an abuse of

reach the issues in its cross-appeal if we find merit in any of Appellants' claims. Since we

do not, we shall not address Appellee's cross-appeal.

discretion." *Cangemi ex rel. Estate of Cangemi v. Cone,* 774 A.2d 1262, 1265 (Pa.Super.2001).

¶ 6 In this case, Appellants argue that where a jury has found that a defendant was negligent "and the existence of an injury was conceded to and not questioned by [the] defendant, the jury is not permitted to find [that] the defendant's negligence was not a substantial factor in bringing about at least some of [the] plaintiff's injuries." Brief for Appellants at 46. In support of this argument, Appellants cite a line of cases involving a jury's finding on causation with regards to injuries that arose from a car accident. In the most recent of these cases, *Andrews v. Jackson,* 800 A.2d 959 (Pa.Super.2002), we addressed this issue and stated:

> Where there is no dispute that the defendant is negligent and both parties' medical experts agree the accident caused **some** injury to the plaintiff, the jury may not find [that] the defendant's negligence was not a substantial factor in bringing about at least **some** of plaintiff's injuries. Such a verdict is contrary to the weight of the evidence adduced at trial. In other words, a jury is entitled to reject any and all evidence up until the point at which the verdict is so disproportionate to the uncontested evidence as to defy common sense and logic.
>
> . . .
>
> [T]he jury's verdict that Appellee **was not "injured" in the accident** goes against the weight of the competent evidence adduced by both parties' medical experts at trial.

*Id.* at 964, 965 (third emphasis added). *Andrews* and all the cases cited by Appellant in support of this argument [2] address the issue of whether a jury that has found

the operator of a motor vehicle to be negligent in causing a collision may then find that this negligence was not a substantial factor in causing an uncontroverted injury that resulted from the collision.

 ¶ 7 However, these cases are distinguishable from the case now before us. In *Andrews* and the other cases that Appellants cite, the jury's finding of negligence established that the negligent operator of the vehicle caused the collision. Whereas those juries' findings on negligence established that the drivers were liable for causing the collision, the jury's decision in this case that Appellee was negligent did not establish that its negligence caused the alleged accident in which Mr. Daniel injured himself. This is so because when an auto accident occurs and one driver is found to be negligent, then absent contributory negligence, the driver's negligence is almost invariably what caused the auto accident. And therefore, if there is an uncontroverted injury that arose from the auto accident, the jury must find that the driver's negligence, which caused the accident, was also a substantial factor in causing the injury.

 ¶ 8 However, we do not extrapolate from this case law that regardless of the factual circumstances, a finding of negligence combined with an uncontroverted injury automatically requires a finding that the negligence was a substantial factor in causing the accident that caused the injury. Rather, the aforementioned case law is limited to a jury's finding on whether the plaintiff was " 'injured' in the accident." *Andrews,* 800 A.2d at 965. Appellants herein have misplaced their reliance, as they are not here arguing about whether Mr. Daniel was injured in the accident, for this issue is not in dispute.

---

2. *See Kruczkowska v. Winter,* 764 A.2d 627 (Pa.Super.2000); *Craft v. Hetherly,* 700 A.2d 520 (Pa.Super.1997); *Rozanc v. Urbany,* 444 Pa.Super. 645, 664 A.2d 619 (1995); *Hawley v. Donahoo,* 416 Pa.Super. 469, 611 A.2d 311 (1992).

¶ 9 Instead, the issue is whether *Appellee's negligence caused the accident* that resulted in the injury. The jury found that it did not, and the trial court concluded that the jury's verdict was proper. As Appellee argues in its brief, there are other factors that may have caused Mr. Daniel's accident, among which may have been his own actions. During trial, Appellee's counsel vigorously cross-examined Mr. Daniel as to his version of the events. Through this cross-examination, counsel attempted to show that Mr. Daniel *did not slip on a wet and oily surface,* but instead lost control of the 800 pound drum "because they were so heavy that he could not keep them stable." N.T., 4/15/02, at 105 (Reproduced Record (R.) at 127). The extensive testimony on this issue is as follows:

Q. You described your incident as saying that when you positioned your hands, one on the barrel and one on the truck, your feet became airborne, is that correct?

A. Yes.

Q. And went over on top of the barrel and fell. Is that accurate?

A. Yes, sir.

Q. When you filed suit in this action, your attorney filed a Complaint. Did you look at that Complaint?

A. Yes, I did.

Q. In the Complaint it says that you fell on premises covered with snow and ice. Did you fall on any snow or ice?

A. I don't recall. I don't remember it that much.

Q. It says that you were caused to slip, trip, stumble and fall in your Complaint.

A. Uh-huh.

Q. Did you ever fall to the floor?

A. When I fell?

Q. Yes.

A. Yes. Because I was on the top of the drum.

Q. What I'm saying is, did you ever fall on the floor?

A. Partially.

Q. Was there anyone at the loading dock when you fell?

A. Other than myself?

Q. Other than yourself.

A. Yes.

Q. Who?

A. There were workers from the factory.

Q. Do you know any of their names?

A. No. I don't remember the names. I don't know their names.

Q. Can you tell me what they look like?

A. They were a couple of white and black guys were working around there.

. . .

Q. Were you also treated at the Juniata Family Practice?

A. Yes, sir.

Q. When you went there, did they ask you what happened?

A. Dr. Gorti asked me what happened.

Q. Did you tell him?

A. Yes, sir.

Q. Did you ever tell him that your arm got pulled by an 800 to 900 pound drum?

A. About 800 pounds drum.

. . .

Q. Dr. Gorti, when you would talk to him, he would ask you questions, you would give answers. Did you ever see him making notes of your conversations?

A. I always seen him writing something.

Q. Did you tell him when you saw him in February of '98 how the accident happened?

A. The same way I told the people in emergency when I went there, that's the same way I told Dr. Gorti.

. . .

Q. I show you an item for identification identified as Defendant's Exhibit number 2. That's a typewritten document, isn't it?

A. Pardon, sir?

Q. Typewritten.

A. Yes.

Q. I've highlighted a portion there. Can you read that to the jury?

A. "The patient reports that he hurt his arm on the job one month ago. His arm got pulled by 8–900 pound drum."

. . .

Q. Did there ever come a time that you gave Dr. Gorti more information about how the accident happened?

A. Probably so. If he asked me.

Q. Do you recall him asking you?

A. I really don't remember it.

. . .

Q. Mr. Daniel, I have in front of you a small copy of this which has been pre-marked as Defendant's Exhibit number 1. I have a blowup here marked as Defendant's Exhibit number 4. If I could direct your attention to your copy, the jury can see here.

The highlighted portion that I have there for you seems to tell your version of how the incident happened. Do you see that, I have highlighted?

A. Uh-huh.

Q. Can you read that for the jury, the part I have highlighted?

A. "As he describes to me he was picking up a delivery and there were drums weighing 700 to 800 pounds. He tells he was trying to move them off the floor and pick them up by rolling them toward him . . . ."

Q. Let me just stop you there for a second.

Just as you described with your coffee cup, you had your hand [on the] truck and your hand[ ] on that barrel and you were trying to roll that toward you; is that correct?

A. Yes, sir.

Q. So what the doctor has down probably came from you describing that to him.

A. Uh-huh.

Q. Okay. Continue reading. Rolling them towards him and?

A. " . . . . move them off the floor and pick them up by rolling them toward him and he had his left hand on the side of the drums and under them **but as he brought them toward him they were so heavy that he could not keep them stable, and he let go with his right hand and the drum went forward and he went forward with it but his left hand was still on the side of the drums, and when it fell to the floor he apparently got some jerking of the left arm and shoulder as he went forward with the drums.**"

Q. He doesn't say anything in there that you described to him that you fell on top of the drum, does he? He doesn't say that in there.

A. Uh-huh.

Q. He doesn't say that; is that correct?

A. No.

Q. He doesn't say that you fell down on the floor either, does he?

A. No. But see specifically—

Q. I'm just asking you, does that note you just read say you fell to the floor in addition to on top of the drum? Does that say that?

A. No.

Q. **Is there anything contained in this note that says your feet slipped in water or grease or oil? Is there anything in that note that says that?**

A. **No.**

Q. If I understand correctly, what you told the doctor is that these barrels are 700 to 800 pounds, they're pretty heavy, they're extremely heavy, and you got some jerking of the arm when the barrel fell to the floor. Is that accurate?

A. Yes. As my foot slipped.

Q. As your foot slipped?

A. As my both foot slipped, the barrel went backwards and my left hand was still on the barrel like I described on this coffee cup.

Q. The jury can't see from there, but it says "as he brought them toward him they were so heavy that he could not keep them stable." It doesn't say they were so heavy because he slipped and they fell out of his hand. Would you agree with me?

A. Can you describe that again, please?

Q. Sure.

It says, "as he brought them toward him they were so heavy that he could not keep them stable." It was the weight that caused you to let go of the barrel. Is that what you told the doctor?

A. When I first slipped the barrel and the weight plus my foot gave.

Q. I understand. It was the weight of the barrel is what you told the doctor that caused it to go forward; is that correct?

A. Yes. Because the drums were filled out with the scrap metal.

Q. They were 700 to 800 pounds; is that correct?

A. Yes.

Q. So at that point when that barrel pulls forward, unless you're more than 700 or 800 pounds, you're going to go with it, correct?

A. Say again.

Q. Sure.

When you're holding on to 700 to 800 pounds and it decides to throw you in this direction, you're going to go with it if you're holding on; is that correct?

A. Uh-huh.

N.T., 4/15/02, 95–97, 99–100, 101–02, 104–08 (R. 102–30) (emphasis added).[3] We recognize that in considering the foregoing, it was within the jury's province as the finder of fact to determine which version of the events it found credible, i.e., did Mr. Daniel slip and fall on a wet and oily spot, or did he lose control of the drum because it was too heavy, only to have his arm jerked in the process. Indeed, Appellee's counsel argued that the jury should accept the latter in his closing argument[4]:

So, it's one thing to say this place this is in horrendous shape. Was it in the horrendous shape on that day? That's the issue. We're not talking about every other day. We're talking about this day. So there wasn't water pouring in on 55 gallon drum fulls on the roof. That wasn't happening that day.

---

**3.** We note that although Appellants claim that the medical records were hearsay, Appellants' counsel did not object to the use of the medical records by Appellee's counsel during his cross-examination of Mr. Daniel, nor have Appellants presented a question for our review challenging the propriety of the use of the medical records during cross-examination.

**4.** A second theory of defense presented by Appellee was brought out during the testimony of William Barlow, Appellee's plant super-

intendent, on cross-examination. Through this cross-examination, Appellee's counsel elicited testimony that although the heater and roof leaked, Mr. Barlow could not recall if they were leaking on the day of Mr. Daniel's alleged slip and fall. N.T., 4/15/02, at 154–55 (R. at 176–77). Accordingly, in its brief to this Court, Appellee argues that "plaintiff was not able to establish through [Appellee's] employees that, on the date in question, the building was exhibiting any of those problems, namely a leaking heater or a leaking roof." Brief for Appellee at 16.

What do we have next? The floor is covered with oil and grease, that it's just a skating rink. Well again, you heard the people sit up on the stand. I don't remember hearing that. That every time they walked anywhere near that one area that they were falling down. In fact, what you heard, when I asked Mr. Barlow, has anyone else other than the plaintiff come into that place and slipped in all the years you've been there, 17 years? He said no.

Let's talk about the heater. Once again, as he said, on occasion it would stick. And previously we used to be able to have a repairman come in. It didn't happen all the time, it would happen without notice if it did. And the heater wouldn't be on. He'd have to come in and get it going for the people to work. So I asked him, on this day, Mr. Barlow, was the heater overflowing? He doesn't know.

Plaintiff has the burden of proof. Plaintiff can't come in and say, well, geez, you know, it usually leaked. And when it rained, it usually came in. And when everything got wet, it was usually slippery. But I can't show you it was raining that day, I can't show you it was leaking. So I really can't show you it was slippery. So what does he rely on? That is called circumstantial evidence. I'll give you all that information. And as plaintiff wants to say, throw it up against the wall and hope it sticks.

. . .

Was there anything leaking, was there anything slippery, was there anything wet? The answer was no, except for one person. The person who seeks to have money damages given to him, seated here, Mr. Daniel.

. . .

**He didn't slip, as he says in his medical record. It was too heavy for him to handle and he was catapulted for-** **ward. Yes, his feet came off the ground. That's not surprising. He's a 185 pound man trying to pull a 700 pound barrel. And without help, he lost his grip and over it went.**

**Did I say that? Did I make that testimony up? No. What did I tell you? I can't speak—I can't provide evidence, I can only ask Mr. Daniel what happened, and I can show you what he told other people.**

. . .

The first thing that we have with respect to the injury—the very first person to hear about the injury isn't here. That's the helper. Isn't that interesting? **The only person who could corroborate, who could go along with, who could support Mr. Daniel's case, his helper, isn't here.** But he does figure into the equation because what do we know he did? The helper went upstairs and called. Mr. Blumberg came. Mr. Blumberg filled out his employer's occupational injury report.

. . .

How about Dr. Gorti? I said, Dr. Gorti, we're looking at your notes and we're looking at the description. And none of your records say [anything] about slipping in ice and snow. In fact, they are very consistent. Defendant's Exhibit 2, Juniata Family Practice, the report of Dr. Gorti for his first visit, February 23, '98. The patient reports he hurt his arm on the job one month ago. His arm got pulled by an 800 to 900 pound drum.

. . .

This is the report from Dr. Werthan from Neurosurgical Associates. I just read you Dr. Gorti's February 23, 1998, here we are April 14th, two months later. This individual doesn't want to just have two words, he wants—or she wants even more information. Tell me how

the accident happened. So he tells me that he has—he was trying to pick up a barrel weighing 700 to 800 pounds. **He tells her he was trying to move them off the floor, pick them up by rolling them towards him, he had his left hand on the side of the drums and under them, but as he brought them toward him, they were so heavy he could not keep them stable. It doesn't say he drew them towards him, he slipped.**

N.T., 4/16/02, 92–93, 94, 95, 96, 100, 101–02 (R. 379–88) (emphasis added).

■ ¶ 10 When we view the foregoing evidence in the light most favorable to Appellee as verdict winner, and the closing argument by Appellee's counsel, we conclude that the verdict does bear a rational relationship to the evidence presented at trial because the jury could have found Mr. Daniel's testimony relaying his version of the events incredible, and it could have instead accepted Appellee's theory of defense. It is important to remember that at its crux this case is about a finding on substantial factor, *i.e.*, causation. Appellants argue that because the jury found that Appellee was negligent, *and Mr. Daniel alleged that such negligence was a substantial factor in causing his injury*, the jury was bound to accept this allegation as the truth. However, in order for a defendant's negligence to be considered a substantial factor in bringing about certain harm to a plaintiff, the negligence must

constitute "conduct [that] has such an effect in producing the harm as to lead reasonable men to regard it as a cause, using that word in the popular sense." *Jeter v. Owens–Corning Fiberglas Corp.*, 716 A.2d 633, 636 (Pa.Super.1998) (quotation marks and citations omitted). Clearly, Appellee's negligence, which is a breach of a duty of care, was its failure to properly maintain its loading dock. But for the jury to also have found that this negligence was a substantial factor in causing Mr. Daniel's injuries, it must have found that this negligence produced the harm. Based on the evidence in this case, the jury could properly have determined that *the negligence did not produce the harm* because what caused Mr. Daniel's injuries was not his slip and fall on an oily and wet surface, but rather his loss of control of an 800 pound drum that had nothing to do with the condition of the floor.[5]

■ ¶ 11 In their next issue presented for our review, Appellants argue that the trial court erred in denying their post-trial motion based on prejudicial remarks made by Appellee's counsel during his opening and closing arguments. Regarding the allegedly improper *opening* remarks, this claim is waived due to Appellants' failure to preserve it in a post-trial motion. *See Diamond Reo Truck Co. v. Mid–Pacific Industries, Inc.*, 806 A.2d 423, 428 (Pa.Super.2002) (stating, "If an issue has not been raised in a post-trial motion, it is waived for appeal purposes.").

---

5. We note that our decision here does not invoke principles of contributory negligence. In order for this to have been an issue in this case, the jury would first had to have determined that Appellee's negligence was a substantial factor in causing Mr. Daniel's alleged accident and the resulting injuries. Then the jury would consider whether Mr. Daniel was contributorily negligent and to what extent such negligence would relieve Appellee of its liability for his injuries. *See* 42 Pa.C.S. § 7102 (stating, "In all actions brought to recover damages for negligence resulting in death or injury to person or property, the fact that the plaintiff may have been guilty of contributory negligence shall not bar a recovery by the plaintiff or his legal representative where such negligence was not greater than the ***causal negligence*** of the defendant or defendants against whom recovery is sought, but any damages sustained by the plaintiff shall be diminished in proportion to the amount of negligence attributed to the plaintiff.") (emphasis added). We reiterate that the jury could have properly reached its determination without considering this issue.

¶ 12 However, in their post-trial motion, Appellants did raise the issue of Appellee's counsel's allegedly improper comments during *closing* arguments. "The grant of a new trial for improper remarks is within the discretion of the trial judge. Further, an appellate court's review of the grant of a new trial is limited to cases of gross abuse of discretion *by the trial judge* or the application of erroneous rules of law by the trial court." *D'Angelis v. Zakuto,* 383 Pa.Super. 65, 556 A.2d 431, 434 (1989). We have reviewed Judge Glazer's opinion on this issue, and there is clearly no abuse of discretion. We also adopt this portion of his opinion for purposes of further appellate review. Trial Court Opinion, 9/13/02, at 5.

¶ 13 Judgment **AFFIRMED**.