J-A10025-17

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| MARTIN WEEKS, JR. | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellant | |
| v. | |
| G&E REAL ESTATE MANAGEMENT SERVICES, INC., D/B/A NEWMARK GRUBB KNIGHT FRANK; CROWN ENERGY SERVICES, INC. OF CALIFORNIA D/B/A ABLE ENGINEERING SERVICES, INC.; AND GCCFC 2007-GG9 MALL OFFICE LIMITED PARTNERSHIP | |
| Appellees | No. 2355 EDA 2016 |

Appeal from the Judgment Entered September 15, 2016
In the Court of Common Pleas of Philadelphia County
Civil Division at No(s): 1957 July Term, 2014

BEFORE: DUBOW, J., SOLANO, J., and FORD ELLIOTT, P.J.E.

MEMORANDUM BY SOLANO, J.:                **FILED SEPTEMBER 28, 2017**

Appellant, Martin Weeks, Jr., appeals from the judgment entered on September 15, 2016, in favor of Appellees, G&E Real Estate Management Services, Inc., d/b/a Newmark Gruff Knight Frank ("G&E Real Estate"); Crown Energy Services, Inc. of California, d/b/a Able Engineering Services, Inc. ("Crown"); and GCCFC 2007-GG9 Mall Office Limited Partnership ("GCCFC Partnership") in this negligence action.  We affirm.

We rely on the trial court's description of this case:

This matter involves an electrocution incident that occurred at the Public Ledger Building ("Public Ledger Building" or "Property") in Philadelphia.  The Public Ledger Building is a [twelve]-story, Georgian Revival-style office building that was

built in 1924 and located at the corner of 6th and Market Streets, overlooking historic Independence Mall. In March 2014, the building owners, LNR Partners, LLC ("LNR") foreclosed upon the Public Ledger Building, due to their default on a $42.5 million loan secured by the Property. GCCFC Partnership, an entity controlled by LNR, then took ownership of the Public Ledger Building and engaged G&E Real Estate to manage the Property. In turn, G&E Real Estate subcontracted responsibility for performing the building's maintenance and repairs to [Crown]. Andrew Pogas (chief engineer for [Crown]) [and] Timothy Borek (assistant chief engineer and plant manager for [Crown]) were employees of [Crown], and responsible for the Public Ledger Building during the aforementioned subcontracting agreement.

In early May 2014, Pogas hired Appellant and Appellant's acquaintance, Allen Madjarcic, to remove trash and other unwanted materials from the Property. This was debris that was typically discarded by various building tenants moving in and out. This work was given with the understanding that neither man would be paid for his effort; instead, Appellant and Madjarcic were given permission to remove scrap metal from the Property, which they could then sell for cash at a junkyard.

On the days they were offered work, Appellant and Madjarcic followed a specific routine. They would drive [to] the Public Ledger Building early-to-midmorning, park their truck by the Property's freight elevator, and then call to say they had arrived. Either Timothy Borek or Andrew Pogas would then come down from their office on the Property's 13th floor via the freight elevator and meet them in the parking area. Borek or Pogas would escort [Appellant and Madjarcic] to wherever [they] were [supposed to work] that day and give [Appellant and Madjarcic] instruction [about] what to take and what not to take. Pogas and/or Borek would tell the men to clean out a specific area of the Property, such as a single room, and would keep tabs on Appellant and Madjarcic as they worked to complete that day's assignment. Once they fulfilled each task, Appellant and Madjarcic would then return to Pogas for further instructions. Finally, Appellant and Madjarcic would leave the Public Ledger Building before 3 PM, so that they could get to the junkyard with their haul before closing time.

After working their way through the Property's upper floors over the course of several months, Appellant and Madjarcic eventually

started working in its basement, which covered a massive area approximately four to five football fields in size. In June 2014, Bogas took Appellant and Madjarcic on a walkthrough of the basement, during the course of which Appellant became fixated with one of the Public Ledger Building's switchgears, a "very large" electrical transformer that connected directly to the power grid and converted the incoming high-voltage energy to a lower voltage for use inside the Property. The switchgear was encased in a metal cover and located inside a chicken wire screened-in enclosure. This enclosure could only be entered in the front via a wooden access door. Multiple warning signs were posted on and around the switchgear, including one that said "DANGER," which depicted a red humanoid figure with a lightning bolt, one reading "AUTHORIZED PERSONNEL ONLY," another declaring "CAUTION UPPER SWITCH SECTIONS ARE ALWAYS ALIVE," and others stating "13,200 VOLTS," "HIGH VOLTAGE POWER," and "DANGER THIS ENCLOSURE CONTAINS HIGH VOLTAGE ELECTRICAL EQUIPMENT AND MUST NOT BE ENTERED EXCEPT BY PERMISSION." Appellant's interest was likely piqued because "a section of [the switchgear's] cover had been removed and you could see all of the copper in it. There was [*sic*] big huge copper coils. There was thick copper wire." N.T. 3/9/16 at 63; **see** N.T. 3/7/16 at 147-48, 253; N.T. 3/8/16 at 29-30, 34-35 (Appellant and Madjarcic testifying to the outsize monetary value of the switchgear's copper, relative to other metals).

Appellant inquired about the switchgear, as he did not know what it was, whereupon Pogas explained its function. This prompted Appellant to ask whether it was fair game for removal, to which Pogas unequivocally replied it was not. However, this apparently did not dampen Appellant's interest, as he subsequently asked Pogas during a separate conversation whether he would receive an electric shock if he touched the switchgear. Pogas informed them the top was actively receiving current, but the rest of the switchgear was not, and would not unless they somehow managed to activate it. Undeterred, Appellant subsequently remarked to Borek that Pogas had said the switchgear was "dead," and proceeded to poke the machinery's exterior with his fingers. Borek advised Appellant and Madjarcic not to touch the switchgear and, within less than a day, told Pogas about his conversation with the men. Pogas then sought out Appellant and Madjarcic, reiterating his previous admonishment by bluntly telling Appellant and Madjarcic "listen, you got to understand, stay away from this thing. We're not

- 3 -

getting rid of [the switchgear], just leave it alone." N.T 3/9/16 at 67.

Determined to steal the copper wiring, Appellant and Madjarcic nevertheless ignored these warnings. On June 25, 2014, they left their assigned work area in the basement, purloined a ladder from a separate storage area in the basement, ripped open the chicken wire meshing that enclosed the area where the switchgear equipment was located, and surreptitiously entered the switchgear enclosure from the rear of an adjacent enclosure. Once inside with the ladder, Appellant and Madjarcic embarked upon a foolhardy attempt to dismantle the switchgear in order to steal the copper wire. While Madjarcic was inspecting the top of the switchgear, Appellant thrust his left arm elbow-deep into the machinery and began removing it using a socket wrench, causing more than 13,000 volts of electricity to course through his body when the wrench and his arm came into contact with an energized section of the switchgear. The intensity of this voltage rendered Appellant unable to move, due to involuntary muscle spasms, until Madjarcic was able to pull him backwards towards safety. Though Appellant survived, he suffered severe burns along his left arm and torso, and ultimately had to have two necrotized fingers amputated from his left hand.

On July 17, 2014, Appellant filed suit via Writ of Summons, followed by a Complaint on October 23, 2014, and an Amended Complaint on December 10, 2014, in which he named G&E Real Estate, [Crown], PLB Partners, LLC, and LNR as defendants.[7] Therein, Appellant asserted he was given permission to dismantle the live electrical switchgear and remove the copper wiring inside, and that there were not sufficient warnings posted around the machinery, arguing that these entities' allegedly negligent and/or reckless conduct had caused him to sustain horrific injuries.

[7] The latter two entities were ultimately released from this case via joint stipulation prior to trial.

The matter proceeded to a jury trial on March 7, 2016, which was presided over by th[e trial c]ourt. Ultimately, the jury returned the following verdict on March 10, 2016 in favor of [Crown,] G&E Real Estate[, and GCCFC Partnership]: 1. Appellant was a trespasser in the switchgear enclosure at the time of the accident; 2. [Crown,] G&E Real Estate[, and GCCFC

- 4 -

Partnership] had breached their duty to Appellant, as a trespasser, by committing willful and wanton misconduct; 3. [Crown] had acted negligently,[1] but G&E Real Estate [and GCCFC Partnership] had not; and 4. [Crown]'s, G&E Real Estate's[, and GCCFC Partnership's] conduct was [not] the factual cause of the harm suffered by Appellant. Subsequently, Appellant filed a Motion for Post-Trial Relief on March 17, 2016[, which included a challenge to the weight of the evidence and a motion for new trial. Appellant's Mot. for Post-Trial Relief, 3/17/16, at 2-3 ¶¶ 9, 11 & *ad damnum* clause]. . . . After considering the arguments presented in the parties' respective submissions, th[e trial c]ourt denied Appellant's Motion on July 14, 2016, a decision which Appellant appealed to the Superior Court on July 20, 2016.

Trial Ct. Op. at 1-6 (some footnotes and citations to the record omitted;

some formatting altered).

Appellant now raises the following issues on appeal:

1. Did the trial court err in failing to grant [Appellant]'s motion for post-trial relief, and order a new trial on the issue of damages, where the jury found that [Appellees] had . . . engaged in culpable conduct, and where both medical experts agreed that the incident resulted in electrical burn injuries resulting in finger amputations, but found that [Appellees'] conduct was not a factual cause of [Appellant]'s harm?

2. Where the jury found that [Appellees] had acted willfully or wantonly in connection with the incident at issue, and where the injuries that resulted were admitted by [Appellees'] medical expert, but the jury found that the conduct of [Appellees] was not a factual cause of harm to [Appellant], was the jury's verdict against the weight of the evidence?

_____

[1] In the jury charge, the trial court equated Question 3 on the verdict sheet ("Were any of the Defendants negligent?"), with whether "they breached any duty of care." N.T., 3/9/16, at 186; **see also id.** at 187 ("there's the duty of care . . . and if you think they breached that, then you'll be determining whether you think they're negligent"). "[T]he law presumes that the jury will follow the court's instructions." **Commonwealth v. Busanet**, 54 A.3d 35, 65 (Pa. 2012), **cert. denied**, 134 S.Ct. 178 (2013).

> 3.      Where the jury's verdict established liability, but [the] jury did not find that the culpable conduct was a factual cause of harm despite the existence of undisputed injuries, resulting in a verdict against the weight of the evidence, did the trial court err in failing to award a new trial on damages pursuant to the holdings in ***Andrews v. Jackson***, 800 A.2d 959 (Pa.Super. 2002), ***Mietelski v. Banks***, 854 A.2d 579 (Pa.Super. 2004)[,] and ***Mano v. Madden***, 738 A.2d 493 (Pa.Super. 1999)?

Appellant's Brief at 4.    These three questions all overlap, as they each concern whether:   (1) the jury properly found that Appellees' conduct was not the factual cause of Appellant's harm; and (2) if that finding was against the weight of the evidence, whether the trial court should have granted a new trial on the issue of damages.   Appellant's Brief at 4.   Thus, we combine our analysis, as did the trial court.   Trial Ct. Op. at 6-10.

Appellant contends that "the jury verdict on 'factual cause' was against the weight of the evidence."   Appellant's Brief at 13.[2]   He continues that "[t]he finding of willful or wanton misconduct, in combination with [Appellant]'s clear and objective injuries present particularly strong reasons to grant a new trial on damages on the particular facts of this case."   ***Id.*** at 17.   Appellant argues that his medical expert "confirmed the causation of [his] injuries." ***Id.*** at 26.

Crown answers that "the jury was entitled to find [Crown's] conduct negligent but not the factual cause of [Appellant]'s injuries" and that

---

[2] Appellant preserved his challenge to the weight of the evidence through his motion for post-trial relief, requesting a new trial.

Appellant "was required to prove a causal connection between [Crown]'s conduct and [his] injury." Crown's Brief at 5.[3]

In their briefs to this Court, the parties debate the applicability of two lines of case law. Appellant relies on decisions in personal injury actions arising out of motor vehicle collisions, *Neison v. Hines*, 653 A.3d 634 (Pa. 1995); *Mano v. Madden*, 738 A.2d 493, 497-98 (Pa. Super. 1999) (*en banc*); and *Andrews v. Jackson*, 800 A.2d 959, 965 (Pa. Super.), *appeal denied*, 813 A.2d 835 (Pa. 2002). He argues that these decisions hold that a jury in a personal injury action may not disregard expert medical testimony that the plaintiff suffered injury as a result of the accident at issue and that the jury's finding that Appellees' conduct was not the factual cause of Appellant's injuries violated this rule. Crown relies on *Daniel v. William R. Dratch Co.*, 849 A.2d 1265 (Pa. Super 2004), a premises liability action, which, Crown contends, supports the verdict in this case. Because we ultimately agree with Crown on this issue, we repeat Crown's analysis at length:

> In *Daniel*, the plaintiff truck driver who was picking up 800-pound barrels of scrap metal from the defendant's premises when he allegedly slipped on a wet, greasy spot on the floor. 849 A.2d at 1266. The plaintiff claimed the defendant negligently maintained its loading dock by allowing oil to build up on the floor, which when combined with water from either a leaking roof or heater ma[de] the floor slippery, causing plaintiff to slip, fall, and injure himself. *Id.* The defendant contended the plaintiff did not slip on a wet and oily surface but instead lost

---

[3] Neither G&E Real Estate nor GCCFC Partnership filed a brief.

control of the 800-pound drum "because they were so heavy that he could not keep them stable." **Id.** at 1269.

The plaintiff and the defendant in **Daniel** each proffered evidence as to their respective theories of causation in a premises liability negligence action. The jury concluded that, although the defendant had been negligent, its negligence was not a substantial factor in causing the plaintiff's injury; hence, the jury rendered a verdict in favor of the defendant. 849 A.2d at 1266. The plaintiff appealed, contending the jury's verdict was against the weight of the evidence. **Id.** at 1267. This Court affirmed the judgment, concluding the trial court did not abuse its discretion in denying the plaintiff's motion for a new trial, because the jury had acted well within its purview in determining the defendant's version of events was more credible. **Id**. at 1267-73.

In **Daniel**, the plaintiff's argument on appeal was virtually identical to [Appellant]'s argument in this appeal, that "where a jury has found that a defendant was negligent and the existence of an injury was conceded to and not questioned by [the] defendant, the jury is not permitted to find [that] the defendant's negligence was not a substantial factor in bringing about at least some of [the] plaintiff's injuries." 849 A.2d at 1268. . . .

This Court in **Daniel** rejected the plaintiff's argument **Andrews** and other motor vehicle accident cases reached beyond their unique set of circumstances to other types of negligence cases. This Court observed **Andrews** and its ilk addressed only "the issue of whether a jury that has found the operator of a motor vehicle to be negligent in causing a collision may then find that this negligence was not a substantial factor in causing an uncontroverted injury that resulted from the collision." 849 A.2d at 1268. In **Andrews** and other cases like it, "the jury's finding of negligence established that the negligent operator of the vehicle caused the collision." **Id**. at 1268 (emphasis added). By contrast, in **Daniel**, "the jury's decision . . . that [the defendant] was negligent did not establish that its negligence caused the alleged accident in which [the plaintiff] injured himself." **Id**. (emphasis added).

In **Daniel** this Court confined its holding in **Andrews** to cases involving motor vehicle accidents.

- 8 -

*Id.* at 7-10. Appellant replies that cases following **Daniel** are unpublished and non-precedential and this Court should not rely upon "only one published case." Appellant's Reply Brief at 2.

Our standard of review of review for a challenge to the weight of the evidence is as follows:

> The weight of the evidence is exclusively for the finder of fact, who is free to believe all, none or some of the evidence and to determine the credibility of the witnesses.
>
> Appellate review of a weight claim is a review of the exercise of discretion, not of the underlying question of whether the verdict is against the weight of the evidence. Because the trial judge has had the opportunity to hear and see the evidence presented, an appellate court will give the gravest consideration to the findings and reasons advanced by the trial judge when reviewing a trial court's determination that the verdict is against the weight of the evidence. One of the least assailable reasons for granting or denying a new trial is the lower court's conviction that the verdict was or was not against the weight of the evidence and that a new trial should be granted in the interest of justice.

**Commonwealth v. Talbert**, 129 A.3d 536, 545–46 (Pa. Super. 2015) (internal brackets, citations, and quotation marks omitted; some additional formatting), **appeal denied**, 138 A.3d 4 (Pa. 2016). "[T]he grant or denial of a new trial [also] rests in the discretion of the trial court." **Livelsberger v. Kreider**, 743 A.2d 494, 495 (Pa. Super. 1999) (citation omitted).

After a thorough review of the record, the briefs of the parties, the applicable law, and the well-reasoned opinion of the Honorable Ellen Ceisler, we conclude that Appellant's challenge to the weight of the evidence merits no relief. The trial court opinion comprehensively discusses and properly

disposes of Appellant's contentions. ***See*** Trial Ct. Op. at 8-10 (finding: although both Appellant's and Crown's medical experts discussed how Appellant had been electrocuted and had suffered injuries as a result of the electrocution, "neither doctor opined (or was qualified to opine) about whose **fault** it was that the accident happened" (emphasis in original); a jury's decision that a defendant breached its duty of care does not establish that this breach **caused** the plaintiff's injuries (citing ***Daniel***, 849 A.2d at 1268-69); the ***Andrews*** line of cases is limited to a jury's finding on whether the plaintiff was injured in the accident, not whether defendant's breach caused the accident; "two extraordinarily different stories of what transpired on June 25, 2014 were presented by the opposing parties," and "it was up to the jury to weigh the evidence and make credibility determinations"; and "the jury was clear in [its] finding that whatever actions Appellees may have committed, that negligence did not cause the Appellant to be injured"). Thus, with respect to Appellant's challenge to the weight of the evidence and his related challenge to the trial court's denial of his motion for a new trial, we affirm on the basis of the trial court's opinion.

The cases on which Appellant relies, including ***Mano***, ***Neison***, and ***Mietelski v. Banks***, 854 A.2d 579 (Pa. Super. 2004), are inapposite, as they all involved factual situations in which the cause of the plaintiffs' injuries was not disputed. In ***Mano***, 738 A.2d at 497-98, the defendant's liability for causing the plaintiff's injuries was fairly determined and free from

doubt. Similarly, in **Neison**, 653 A.2d at 637, the plaintiff presented uncontradicted evidence of a violent automobile accident for which the defendant conceded negligence. Here, liability was contested at trial.

Appellant mentions **Mietelski** only in a string cite and does not attempt to explain its application to his action, even though he listed it as a controlling decision in his brief's statement of questions involved. **See** Appellant's Brief at 15. To the extent that we were to consider **Mietelski**, we would conclude that it actually undermines Appellant's argument, as it clearly distinguishes proof of causation from proof of injury:

> Since causation is an essential element of a negligence action, where the degree of harm resulting from the accident is contested by the defendant the case remains essentially in the same posture as a case where causation is fully contested. That is, the jury must be instructed that the *defendant is liable **only** for those injuries that the defendant's negligence was a substantial factor in bringing about*. In such a case, the jury is still not empowered to reject the uncontested evidence that some injury has resulted from the accident; however, *the plaintiff is not relieved of his/her obligation to prove that the injury he/she is seeking recovery for has resulted from the defendant's negligence*.

854 A.2d at 583-84 (bold emphasis in original; italicized emphasis added) (footnotes and citations omitted).

Thus, **Mano**, **Mietelski**, and **Neison** are not controlling, and all of Appellant's issues lack merit. The parties are instructed to attach a copy of the trial court's opinion dated December 2, 2016, to all future filings in this matter that cite this memorandum.

Judgment affirmed.

*Judgment Entered.*

![signature of Joseph D. Seletyn]

*Joseph D. Seletyn, Esq.*
*Prothonotary*


*Date: 9/28/2017*