James J. WINSCHEL, Administrator of the Estate of Robert J. Winschel, Jr., Appellant

v.

Ajay JAIN, M.D., Appellee.

James J. Winschel, Administrator of the Estate of Robert J. Winschel, Jr., Appellee

v.

Ajay Jain, M.D., Appellant.

Superior Court of Pennsylvania.

Argued Nov. 25, 2006.

Filed May 1, 2007.

Reargument Denied July 6, 2007.

Matthew J. McLaughlin, Erie, for Winschel.

Ronald M. Puntil, Pittsburgh, for Jain.

BEFORE: ORIE MELVIN, McCAFFERY, and TAMILIA, JJ.

OPINION BY McCAFFERY, J.:

¶ 1 Appellant, James J. Winschel, administrator of the estate of Appellant's decedent, Robert J. Winschel, Jr. (hereinafter "Decedent"), appeals from the judgment entered against him after the trial court denied his motion for a new trial in a medical malpractice action brought against Appellee and Cross–Appellant, Ajay Jain, M.D. (hereinafter "Dr. Jain"). Specifically, Appellant contends that the verdict was against the weight of the evidence because, even though the jury found Dr. Jain negligent, it ignored undisputed evidence that Dr. Jain's negligence was the cause of Decedent's death. After careful review, we reverse and grant a new trial.

¶ 2 The relevant facts and procedural history of this case are as follows. In February 2002, after an episode of chest pain, Decedent was referred by Dr. Hrinda, his family physician, to Dr. Jain, a cardiologist, for a stress test. During the office visit, Dr. Jain obtained a medical history from Decedent, which revealed multiple risk factors for coronary artery disease, including diabetes, cigarette smoking, elevated cholesterol, hypertension, and a family history of premature heart disease. Dr. Jain began to administer a treadmill stress test, but had to halt the test prior to completion because of Decedent's complaints of fatigue. Dr. Jain then performed another diagnostic test, known as a persantine SPECT scan test,[1] on Decedent. No abnormalities were detected by these diagnostic tests, and no further testing was recommended. However, on May 14, 2002, approximately three months after the tests were conducted, Decedent suffered a cardiac event and died at age forty-five. Dr. Mary Ellen Reitz conduct-

ed an autopsy and concluded that the cause of death was acute myocardial infarction, secondary to complete obstruction of the left coronary artery.

¶ 3 On August 6, 2003, Appellant filed suit against Dr. Jain, alleging negligence in Dr. Jain's failure to diagnose the obstruction in Decedent's left coronary artery. At trial, Appellant specifically alleged that the treatment of Decedent fell below the standard of care for a cardiologist because Dr. Jain had failed to recommend that Decedent, who had virtually every risk factor for coronary artery disease and who had suffered chest pain, undergo cardiac catheterization in order to rule out a life-threatening arterial obstruction.

¶ 4 To support this theory, Appellant offered the testimony of two board-certified cardiologists, Dr. Robert Stark and Dr. Halbert Feinberg, both of whom testified that Dr. Jain's treatment of Decedent fell below the standard of care for a cardiologist because Dr. Jain had failed to recommend a catheterization. In turn, the defense presented the testimony of two other board-certified cardiologists, Dr. Jeffrey Garret and Dr. George Beller. They opined that Dr. Jain's treatment of Decedent had not deviated from the appropriate standard of care because, although Decedent had multiple risk factors for coronary artery disease, his stress test and SPECT test were normal and thus cardiac catheterization was not indicated.

¶ 5 On the issue of causation, Appellant again relied on the testimony of Drs. Stark and Feinberg. These two expert witnesses opined, based on Decedent's medical history and Dr. Reitz's autopsy report, that Decedent's death had resulted from a total or nearly total occlusion of his left coronary artery. They further noted, based on the autopsy report, that Decedent had suffered several mini heart attacks prior to his fatal cardiac event, as revealed by multiple regions of scarring in his heart. Therefore, in the opinion of Appellant's cardiology experts, when Dr. Jain tested Decedent less than three months before his death, his left coronary artery was already substantially occluded and the occlusion would have been detected by catheterization. Appellant also offered the testimony of Dr. Eric Vey, a board-certified forensic pathologist for the Erie County Coroner's Office. In agreement with Drs. Stark and Feinberg, Dr. Vey testified that the near total occlusion of Decedent's left coronary artery was a factual cause of his death, had developed over a long period of time, and would have been clinically significant three months before his death, i.e., at the time that Dr. Jain administered the stress test. Drs. Stark, Feinberg, and Vey all agreed that lesions in the proximal region of the left anterior descending coronary artery ("LAD artery"), such as the lesion detected upon autopsy of Decedent, are typically referred to as "widow makers" because they frequently result in sudden death. (Notes of Testimony ("N.T.") Trial, 2/15/06, at 52, 121–22, 163).

---

1. At trial Dr. Jain explained that the persantine SPECT test is a diagnostic test to detect coronary disease, which is performed by injecting radionuclide tracers intravenously and generating images of the heart as the tracer travels through. (*See* Notes of Testimony ("N.T.") Trial, 2/16/06, at 17; *see also* N.T., 2/15/06, at 27, for concurring testimony of Dr. Robert Stark).

¶ 6 Defense expert Dr. Beller conceded that Decedent had died because of an almost totally occluded LAD artery and that the artery would not have been normal three months before his death, *i.e.*, at the time he was seen by Dr. Jain. Although Dr. Beller testified that he was unable to estimate the extent of the occlusion of Decedent's LAD artery three months before the fatal cardiac event, he also acknowledged that, had catheterization been performed, it would have detected whatever occlusion was there, even if the occlusion had been only 40–50 percent.[2]

¶ 7 The jury returned a verdict in favor of Dr. Jain. Specifically, the jury indicated that although it found the conduct of Dr. Jain to be below the applicable standard of care, it also found that Dr. Jain's negligence was not a factual cause of Decedent's death. Appellant filed a motion for post-trial relief seeking a new trial. Appellant argued that the jury's conclusion as to causation was against the weight of the evidence and indeed was inconsistent with all the medical testimony as to causation that had been proffered at trial. In response, Dr. Jain then also filed a motion for post-trial relief, contending that the trial court had erred in excluding the deposition testimony of pathologist Dr. Reitz, who had performed the autopsy on Decedent. Dr. Jain had sought at trial to introduce portions of Dr. Reitz's deposition in which she had suggested the possibility of an alternate cause of death; however, the trial court had excluded the testimony as too speculative and inconsistent with findings in her autopsy report. Dr. Jain also contended in his post-trial motion that the trial court had erred by precluding the testimony of other expert witnesses regarding possible alternate causes of death and regarding the standard of care for a cardiologist.

¶ 8 The trial court denied Appellant's post-trial motion, thus rendering Dr. Jain's motion moot. Appellant filed a motion for reconsideration, which was also denied. Judgment was entered on the verdict in favor of Dr. Jain on June 1, 2006.[3] Appellant appealed to this Court and Dr. Jain cross-appealed.

¶ 9 Appellant raises one issue for our review which he articulates as follows:

> Whether the trial court abused its discretion and erred in denying [Appellant's] motion for a new trial where the jury concluded that defendant physician was negligent in failing to recommend a catheterization be performed on [Appellant's] decedent on February 22, 2002, in order to detect a blockage in [Appellant's] decedent's left coronary artery that caused his death on May 14, 2002, at age 45, but also inexplicably determined that the negligence was not a factual cause of the death despite the fact that all of the medical testimony and evidence proffered at trial conclusively established that the blockage existed and would have been detectable on February 22, 2002, through the use of a catheterization; [Appellant's] decedent's death was caused by the blockage in the left coronary artery; [Appellant's] decedent was absolutely salvageable if the blockage had been diagnosed and defendant physician did not present any medical testimony or evidence challenging causation.

(Appellant's Brief at 5). Stated more succinctly, Appellant's issue is a contention

---

**2.** Appellant also presented expert testimony as to economic damages, *i.e.*, the wages Decedent would have earned throughout his expected working life.

**3.** The jury verdict was rendered on February 22, 2006, but apparently due to an oversight, there was a delay of several months in entering judgment on the verdict.

that the verdict was against the weight of the evidence. Appellant seeks a new trial on damages only, on causation and damages, or on all issues.

¶ 10 Dr. Jain's cross-appeal presents the following issue with multiple subparts for our review:

Whether or not the Trial Court abused its discretion or committed an error of law by denying [Dr. Jain's] Motion for Post–Trial Relief, requesting a new trial on the basis that the Trial Court erred as a matter of law [a] in precluding the testimony of Dr. Reitz; [b] in precluding [Dr. Jain] from offering alternative theories of causation; [c] in precluding Drs. Beller and Garrett from testifying as to the standard of care[;] and [d] in limiting the testimony of Dr. Beller.

(Dr. Jain's Brief at 2).

■ ¶ 11 We begin by addressing Appellant's challenge to the weight of the evidence, guided by the following well-established principles.

A new trial based on weight of the evidence issues will not be granted unless the verdict is so contrary to the evidence as to shock one's sense of justice; a mere conflict in testimony will not suffice as grounds for a new trial. Upon review, the test is not whether this Court would have reached the same result on the evidence presented, but, rather, after due consideration of the evidence found credible by the jury, and viewing the evidence in the light most favorable to the verdict winner, whether the court could reasonably have reached its conclusion. Our standard of review in denying a motion for a new trial is to decide whether the trial court committed an error of law which controlled the outcome of the case or committed an abuse of discretion.

*Daniel v. William R. Drach Co., Inc.*, 849 A.2d 1265, 1267–68 (Pa.Super.2004) (quotations and citations omitted). We stress that if there is any support in the record for the trial court's decision to deny the appellant's motion for a new trial based on weight of the evidence, then we must affirm. *Carrozza v. Greenbaum*, 866 A.2d 369, 380 (Pa.Super.2004), *appeal granted in part on unrelated grounds*, 584 Pa. 154, 882 A.2d 1000 (2005). An appellant is not entitled to a new trial where the evidence presented was conflicting and the fact-finder could have decided in favor of either party. *Kruczkowska v. Winter*, 764 A.2d 627, 629 (Pa.Super.2000).

■ ¶ 12 Medical malpractice is a species of negligence; therefore, to prevail in a medical malpractice suit, a plaintiff must plead and prove the four elements of negligence:

(1) the physician owed a duty to the patient; (2) the physician breached that duty; (3) the breach of duty was the proximate cause of, or a substantial factor in, bringing about the harm suffered by the patient; and (4) the damages suffered by the patient were a direct result of that harm.

*Corrado v. Thomas Jefferson University Hospital*, 790 A.2d 1022, 1030 (Pa.Super.2001) (citation omitted).

■ ¶ 13 To establish the causation element in a professional negligence action, the plaintiff is *not* required to show that the defendant's negligence was the actual "but for" cause of the plaintiff's harm. *Carrozza, supra* at 380. Rather, under the "increased-risk-of-harm" standard, the plaintiff must introduce sufficient evidence that the defendant's conduct increased the risk of the plaintiff's harm. *Id.* Our Supreme Court has provided the following guidance in applying this standard:

Once a plaintiff has demonstrated that the defendant's acts or omissions ...

have increased the risk of harm to another, such evidence furnishes the basis for the fact-finder to go further and find that such increased risk was in turn a substantial factor in bringing about the resultant harm; the necessary proximate cause will have been made out if the jury sees fit to find cause in fact.

*Sutherland v. Monongahela Valley Hospital*, 856 A.2d 55, 60 (Pa.Super.2004) (quoting *Hamil v. Bashline*, 481 Pa. 256, 272, 392 A.2d 1280, 1288 (1978)). In other words, once the plaintiff introduces evidence that a defendant-physician's negligent acts or omissions increased the risk of the harm ultimately sustained by the plaintiff, then the jury must be given the task of balancing the probabilities and determining, by a preponderance of the evidence, whether the physician's conduct was a substantial factor in bringing about the plaintiff's harm. *Carrozza, supra* at 380–81.

An example of this type of case is a failure of a physician to timely diagnose breast cancer. Although timely detection of breast cancer may well reduce the likelihood that the patient will have a terminal result, even with timely detection and optimal treatment, a certain percentage of patients unfortunately will succumb to the disease. This statistical factor, however, does not preclude a plaintiff from prevailing in a lawsuit. Rather, once there is testimony that there was a failure to detect the cancer in a timely fashion, and such failure increased the risk that the woman would have either a shortened life expectancy or suffered harm, then it is a question for the jury whether they believe, by a preponderance of the evidence, that the acts or omissions of the physician were a substantial factor in bringing about the harm.

*Mitzelfelt v. Kamrin*, 526 Pa. 54, 62–63, 584 A.2d 888, 892 (1990) (cited in *Carrozza, supra* at 380).

■ ¶ 14 Unless the medical malpractice is obvious and self-evident, expert testimony is required in order for the plaintiff to sustain his or her burden of proof with regard to the elements of duty, breach, and causation. *Quinby v. Plumsteadville Family Practice, Inc.*, 589 Pa. 183, 197, 907 A.2d 1061, 1070 (2006). More specifically, in most instances of medical malpractice, where the events and circumstances of the case are beyond the knowledge of the average layperson,

the plaintiff must present expert testimony that the acts of the medical practitioner deviated from good and acceptable medical standards, and that such deviation was a substantial factor in causing the harm suffered.

*Sutherland, supra* at 60 (citation omitted); *see also Kennedy v. Sell*, 816 A.2d 1153, 1158–59 (Pa.Super.2003) (stating that the burden to establish the elements of malpractice rests with the plaintiff and the defendant has no burden of proof). For expert testimony to be admissible, it must be rendered "within a reasonable degree of medical certainty." *Carrozza, supra* at 379 (citation omitted).

¶ 15 In a negligence case, as in other actions, the jury is charged with fact-finding and credibility assessments. So long as the jury's determinations have support in the record, we will defer to them. For example, in *Daniel, supra*, 849 A.2d at 1273, the plaintiff and the defendant each proffered evidence as to their respective theories of causation in a slip and fall negligence action. The jury concluded that, although the defendant had been negligent, his negligence was not a substantial factor in causing the plaintiff's injury; hence, the jury rendered a verdict in favor of the defendant. *Id.* at 1266. The plain-

tiff appealed, contending that the jury's verdict was against the weight of the evidence. This Court affirmed the judgment, concluding that the trial court did not abuse its discretion in denying the plaintiff's motion for a new trial because the jury had acted well within its purview in determining that the defendant's version of events was more credible. *Id.* at 1273.

¶ 16 A different result was reached in *Cangemi v. Cone,* 774 A.2d 1262 (Pa.Super.2001), another case in which a plaintiff-appellant contended that a jury verdict was against the weight of the evidence. In *Cangemi,* the jury found that the defendant-physician had been negligent in failing to diagnose an abdominal aneurysm, but further concluded that the negligence was not a substantial factor in the death of the decedent and so rendered a verdict in favor of the defendant-physician. *Id.* at 1265. This Court reversed and remanded for a new trial because, contrary to the jury's verdict, causation had not been at issue in the case. The plaintiff's medical expert had testified that, had the aneurysm been diagnosed earlier, surgery would very likely have been successful in saving the decedent's life. The defense did not contest or in any way contradict the plaintiff's statement of causation. Therefore, the panel concluded that there was no rational relationship between the evidence adduced at trial and the jury's determination that the defendant's negligence in failing to diagnose the decedent's condition promptly had not been a substantial factor in the death of the decedent. *Id.* at 1265–66.

¶ 17 In the case *sub judice,* Appellant claims that, as in *Cangemi,* the jury's verdict bears no rational relationship to the evidence presented. The jury found that Dr. Jain had been negligent in his treatment of Decedent, but then also found that the negligence had not been a factual cause of Decedent's death. Appellant contends that, because his expert witnesses established the element of causation with evidence that was uncontradicted and uncontested, the jury's verdict was irrational. We agree.

¶ 18 In the autopsy report prepared by pathologist Dr. Reitz, the cause of Decedent's death is given as acute myocardial infarction secondary to complete obstruction of the left coronary artery. The testimony and the written reports of Appellant's three expert witnesses make expressly clear that all of them concluded that total obstruction of Decedent's LAD artery had led to his sudden death, consistent with the autopsy report.[4] Dr.

---

4. The following excerpts of testimony are illustrative of Appellant's experts' opinions:

Dr. Vey, a forensic pathologist, reviewed the autopsy report, as well as slides of tissue samples from the autopsy, and then testified as follows:

[Appellant's Counsel]: Do you have an opinion within a reasonable degree of medical certainty as to the cause of death in this case?
[Dr. Vey]: Yes, I do.
[Appellant's Counsel]: And can you tell the jury what that opinion is?
[Dr. Vey]: Yes. My opinion ... was that the cause of death was cardiac in nature and could be appropriately classified as what's termed a sudden cardiac death.

* * *

[Appellant's Counsel]: And can you tell the jury what—to what extent [Decedent's] left coronary artery was blocked?
[Dr. Vey]: The records indicate basically that the left coronary artery was either completely occluded or near totally occluded. Now, my review of the microscopic slides of the left coronary artery lesion in question reveals that the occlusion was near totally, almost—basically there was a pinpoint, residual lumen through which blood could pass, but otherwise the artery was completely blocked with fibrocalcific atherosclerotic plaque.
[Appellant's Counsel]: And, Doctor, do you have an opinion within a reasonable degree

Jain himself testified that he did not dispute the cause of death as given on the autopsy report, explaining that he was not a pathologist and therefore would rely on the determinations of the pathologist. (N.T., 2/16/06, at 93). At trial, no expert for the defense contested or contradicted the evidence that the cause of Decedent's death was total or near total obstruction of his LAD artery, which had led to sudden cardiac death.

¶ 19 Despite all the uncontradicted evidence as to Decedent's cause of death, Dr. Jain nonetheless insists that the jury might have concluded that Decedent died

> of medical certainty as to whether or not that either total occlusion or near total occlusion in [Decedent's] LAD artery ... was a factual cause of [his] death on May 14, 2002?
> [Dr. Vey]: Yes, in my opinion it was.

(N.T., 2/15/06, at 159–61).

Dr. Stark, Appellant's cardiologist expert, testified as follows:

> [Appellant's Counsel]: Based upon your review of the records, including the autopsy report and the tissue sample slides of [Decedent's] heart that ... were harvested at autopsy, do you have an opinion within a reasonable degree of medical certainty as to the cause of [Decedent's] death eighty[-]two days after he was discharged from Defendant Jain's care?
> [Dr. Stark]: I do.
> [Appellant's Counsel]: And can you tell me what your opinion is, please?
> [Dr. Stark]: It was a heart attack from that blockage. It may also have been an acute arrhythmia, that is, a fatal heart rhythm that was caused by that heart attack. That frequently happens when a segment of heart muscle dies.
> [Appellant's Counsel]: Do you have an opinion within a reasonable degree of medical certainty as to whether or not the occlusion—almost complete occlusion noted in [Decedent's] LAD artery was a substantial factor in causing [his] death?
> [Dr. Stark]: Yes.
> [Appellant's Counsel]: And what is your opinion?
> [Dr. Stark]: Definitely was.
> * * *

of an alternative cause, specifically, a stroke. To support this theory, Dr. Jain relies on one small portion of Dr. Vey's testimony in which Dr. Vey stated, in response to defense counsel's direct question, that the only way to rule out a stroke was to perform an autopsy of the brain, which had not been conducted on Decedent. (N.T., 2/15/06, at 180). However, Dr. Jain ignores other portions of Dr. Vey's testimony which make explicitly clear that he had found no indication that Decedent had suffered a stroke:

> [Appellant's Counsel]: Is there any evidence, Doctor, whatsoever after review-

> [Appellant's Counsel]: Doctor, do you have an opinion within a reasonable degree of medical certainty as to whether or not the severe occlusion in [Decedent's] LAD artery noted at autopsy on May 15, 2002 would have been severe eighty[-]two days earlier when Doctor Jain treated [Decedent] on February 22, 2002?
> [Dr. Stark]: Yes, I do.
> [Appellant's Counsel]: And what is your opinion on that issue?
> [Dr. Stark]: It would have been just about as severe as it was on the day he died. The lesion would have been there and almost the same size.
> [Appellant's Counsel]: And how do you arrive at that opinion; can you tell the jury?
> [Dr. Stark]: Lesions like this grow slowly over time, like calcium depositing in a water pipe in an older home. It doesn't just deposit in one or two months, it takes months and years.

(N.T., 2/15/06, at 53–55). (Dr. Stark's deposition testimony was shown by videotape at trial to the jury.)

Dr. Feinberg, Appellant's other cardiologist expert, also gave testimony as to the cause of Decedent's death:

> [Appellant's Counsel]: Doctor, do you have an opinion within a reasonable degree of medical certainty as to whether the occlusion in [Decedent's] LAD artery ... was the cause of his death?
> [Dr. Feinberg]: Yes.
> [Appellant's Counsel]: And what is your opinion?
> [Dr. Feinberg]: That it was the cause of death.

(N.T., 2/15/06, at 135).

ing the autopsy report and the tissue samples of [Decedent's] heart, that [he] died of anything else but a total occlusion of the left coronary artery?

[Dr. Vey]: No.

[Appellant's Counsel]: And is there any evidence, for instance, that given the fact that an autopsy wasn't performed on the brain—is there any evidence that a stroke or some problem in the brain caused [Decedent's] death as opposed to a total occlusion?

[Dr. Vey]: Not to my knowledge, no.

(N.T., 2/15/06, at 182).

¶ 20 Neither Dr. Vey's testimony, nor any other evidence presented at trial, constitutes evidence that Decedent died of a stroke or any abnormality other than a totally obstructed LAD artery. Furthermore, the trial court expressly acknowledged that an LAD artery occlusion caused Decedent's death. (*See* Trial Court Opinion, dated April 3, 2006, at 1; *see also* N.T., 2/16/06, at 177, where the court stated that it was known from objective evidence that Decedent "died from an occluded or close to being occluded [LAD] artery").

¶ 21 It was also undisputed at trial that, had Decedent undergone a catheterization, his risk of a fatal cardiac event due to LAD artery obstruction would have decreased. Taken in steps, the evidence for decreased risk is as follows: (1) a partial obstruction in Decedent's LAD artery was present three months before his death, *i.e.*, at the time Dr. Jain administered a stress test; (2) the partial obstruction could have been detected at that time had a catheterization test been performed; and (3) once the obstruction was diagnosed, appropriate medical intervention could have diminished its extent and thereby decreased the risk that it would cause Decedent's death.

¶ 22 With regard to step (1), the witnesses agreed that Decedent's LAD artery would have been obstructed to some degree three months before his death, because these types of lesions take a long time to develop. That there was considerable disagreement as to the precise extent of the obstruction does not detract from the fact that *all* agreed that the artery was not normal and some obstruction was present. Dr. Stark, who testified for Appellant, opined that the LAD artery obstruction at the time of Decedent's stress test in February 2002, would have been almost as extensive as it was at the time of his death three months later in May 2002. *See supra* n. 4. Dr. Vey, the forensic pathologist who testified for Appellant, also opined that the LAD artery would have been at least 75% obstructed in February 2002. (N.T., 2/15/06, at 165, 167). Dr. Vey further testified that he agreed with the deposition testimony of Dr. Reitz, who had conducted the autopsy on Decedent, as to her opinion that the obstruction in the LAD artery was clinically significant in February 2002, because this type of lesion takes years to develop. (*Id.* at 165, 167). Dr. Jain acknowledged that the obstruction had developed over a long period of time, but he testified that he could not estimate the extent of the obstruction when he saw Decedent in February 2002. (N.T., 2/16/06, at 90, 91). While Dr. Jain testified that no one (other than "God") could state with certainty the extent of the blockage in February 2002, he also testified that he was *not* saying that the estimates of Drs. Vey and Reitz as to extent of blockage were wrong. (*Id.* at 90, 93). Finally, Dr. Beller, a defense witness, acknowledged that there would have been some narrowing of Decedent's LAD artery in February 2002, but he testified that he had no idea what the extent of obstruction would have been at that time. (N.T., 2/20/06, at 71–75). Thus, while the wit-

nesses differed in their quantitative estimate of the extent of obstruction in Decedent's LAD artery in February 2002, they all agreed that some degree of obstruction would have been present at that time.[5]

¶ 23 With regard to step (2), whether the partial obstruction would have been detected had a catheterization been performed on Decedent, several witnesses for both parties testified as to the very high sensitivity of catheterization in detecting an arterial obstruction. Specifically, defense cardiology expert Dr. Garrett opined that catheterization was approximately 100 percent accurate in detecting an obstructed left coronary artery. (N.T., 2/17/06, at 50–51). Another defense cardiology expert, Dr. Beller, testified that the accuracy was 100 percent if there was total obstruction of the artery. (N.T., 2/20/06, at 61). Dr. Jain himself testified that the accuracy rate of catheterization in detecting an obstruction is virtually 100 percent. (N.T., 2/16/06, at 85). Appellant's experts also testified that Decedent's arterial obstruction would have been detected by catheterization three months prior to his death. *No* evidence was offered to the contrary. Finally, Appellant presented uncontested evidence that, had Decedent's occlusion of the LAD artery been diagnosed and appropriately treated, his fatal cardiac event in May 2002 could very likely have been avoided.

¶ 24 In summary, the undisputed evidence presented at trial establishes the following. When Decedent underwent a stress test in February 2002, three months before his death, his LAD artery exhibited some degree of obstruction. Had Decedent also undergone catheterization, the LAD artery obstruction would very likely have been diagnosed, and medical and/or surgical intervention would very likely have been successful. However, catheterization was not performed, the partial obstruction went undiagnosed, and Decedent died in May 2002, of a cardiac event precipitated by a totally or near totally obstructed LAD artery.

¶ 25 Given this undisputed evidence, we must conclude that Appellant succeeded in establishing the causation element under the increased risk of harm standard. Dr. Jain's failure to diagnose Decedent's obstructed LAD artery clearly increased the risk that Decedent would experience a fatal cardiac event due to the obstructed artery. The jury's conclusion that, although Dr. Jain was negligent, his negligence was not a factual cause of Decedent's death, bears no rational relationship to the undisputed evidence. Therefore, we reverse the judgment against Appellant and grant Appellant a new trial.[6]

¶ 26 We now turn to Dr. Jain's questions for review, all of which are chal-

5. Dr. Jain attempts to rely on the fact that Appellant did not establish that Decedent's LAD artery was totally obstructed when Dr. Jain administered the stress test three months before decedent's death. We agree that Appellant did not prove that the artery was *completely* obstructed at that time. However, we also conclude that Appellant was not required to prove complete or nearly complete obstruction of the LAD artery three months before death. Appellant did establish that the artery was partially obstructed at that time and, as explained in the text *infra,* partial obstruction was sufficient to generate an in-

creased risk of harm due to failure to diagnose the obstruction.

6. Dr. Jain also argues that Appellant waived his weight of the evidence claim by failing to raise it prior to the discharge of the jury. This argument is totally lacking in merit in light of our Supreme Court's holding in *Criswell v. King,* 575 Pa. 34, 45, 834 A.2d 505, 512 (2003) (holding that "a claim challenging the weight of the evidence is not the type of claim that must be raised before the jury is discharged").

lenges to the trial court's decisions to exclude certain expert testimony. Because some if not all of these issues may arise again in the context of a new trial, we will consider their merits. When we review a trial court's ruling on the admission or exclusion of evidence, including the testimony of an expert witness, our standard is well-established and very narrow. Our job is decidedly *not* to assess independently the proffered testimony. Rather, the decision to admit or exclude evidence lies within the sound discretion of the trial court, and we may reverse only upon a showing of abuse of discretion or error of law. *Quinby, supra* at 210, 907 A.2d at 1078; *Smith v. Paoli Memorial Hospital,* 885 A.2d 1012, 1016 (Pa.Super.2005). "An abuse of discretion may not be found merely because an appellate court might have reached a different conclusion, but requires a result of manifest unreasonableness, or partiality, prejudice, bias, or ill-will, or such lack of support so as to be clearly erroneous." *Grady v. Frito–Lay, Inc.,* 576 Pa. 546, 559, 839 A.2d 1038, 1046 (2003). In addition, "[t]o constitute reversible error, an evidentiary ruling must not only be erroneous, but also harmful or prejudicial to the complaining party." *McClain v. Welker,* 761 A.2d 155, 156 (Pa.Super.2000) (citation omitted).

■■■ ¶ 27 In order for opinion testimony of an expert witness to be admissible in a medical malpractice case, the testimony must be rendered within a reasonable degree of medical certainty. *Carrozza,* 866 A.2d at 379. The trial court must look to the substance and the entirety of the testimony in order to determine whether it meets this standard. "That an expert may have used less definite language does not render his entire opinion speculative if at some time during his testimony he expressed his opinion with reasonable certainty." *Id.* (citation omitted). The expert

need not testify with absolute certainty or rule out all possible alternative causes of the plaintiff's injury. *Corrado,* 790 A.2d at 1031. However, the expert does *not* meet the required standard of certainty if he or she testifies "that the alleged cause 'possibly', or 'could have' led to the result . . . or even that it was 'very highly probable' that it caused the result." *Id.* (citation omitted). Expert testimony that does not meet the standard of reasonable degree of medical certainty is properly excluded.

¶ 28 In Dr. Jain's first evidentiary challenge, he contends that the trial court erred in excluding or severely limiting the testimony of Dr. Reitz, the pathologist who conducted the autopsy on Decedent the day after his death and apparently at the request of the family. At trial, Dr. Jain proffered the testimony of Dr. Reitz to support his theory that Decedent's death may have been caused by an event other than an occluded LAD artery.

¶ 29 In Dr. Reitz's autopsy report, which was prepared shortly after the autopsy in May 2002, she concluded that the cause of Decedent's death was a myocardial infarction secondary to a completely obstructed left coronary artery. When she was deposed in June 2004, she articulated a more complex view of the cause of death, noting that, along with an occluded left coronary artery, Decedent also had an aberrant circumflex artery which "might have" led to a fatal acute cardiac arrhythmia, as this type of abnormal arterial structure "does set people up" for arrhythmias and can lead to sudden death. (*See* Dr. Jain's Brief at 24–25). Although Dr. Reitz noted the finding of an aberrant circumflex artery in her autopsy report, she did not indicate or imply that it was a contributing cause of Decedent's death in that report.

■■ ¶ 30 At trial, Dr. Jain sought to present Dr. Reitz as an expert witness as to the issue of cause of death, but the trial

court limited her testimony to the cause of death indicated in the autopsy report, *i.e.,* myocardial infarction secondary to complete obstruction of the left coronary artery. The court would not allow her to testify as to statements that she made in her deposition regarding the aberrant circumflex artery and its possible contributing role in decedent's death. (*See* N.T., 2/14/06, at 6–7). The trial court gave two major and independent reasons for its ruling on Dr. Reitz's testimony. First, the trial court found that Dr. Reitz's statements concerning the possible role of Decedent's aberrant circumflex artery were highly speculative. At no time did she state her opinion regarding the possible role of the aberrant circumflex artery in Decedent's death with the requisite degree of medical certainty. (*See id.* at 7; N.T., 2/16/06, at 70, 72). Secondly, the trial court found that, notwithstanding Dr. Reitz's deposition testimony concerning the aberrant circumflex artery, she had unequivocally concluded that Decedent's totally obstructed left coronary artery was, at the very least, a major contributing factor in his death. (N.T., 2/16/06, at 73). Her autopsy report listed only one cause of death—myocardial infarction secondary to a completely obstructed left coronary artery. Her deposition testimony brought in a second possible contributing factor, but it most certainly did *not* refute the major role played by the obstructed left coronary artery in Decedent's fatal cardiac event.

¶ 31 Based upon our review of the relevant documents and testimony, we conclude that the trial court did not abuse its discretion in excluding Dr. Reitz's testimony concerning a cause of death other than the obstructed left coronary artery. The trial court's rationales for excluding the evidence are well-supported by the record and the law, and therefore we will not disturb the trial court's ruling.

¶ 32 In Dr. Jain's second evidentiary challenge, he contends that the trial court erred in precluding him from offering testimony as to the possibility that the cause of Decedent's death had been a stroke. Specifically, Dr. Jain contends that the court did not allow him to cross-examine Dr. Vey, Appellant's forensic pathologist expert, concerning the possibility that Decedent had suffered a stroke which would not have been detected at autopsy because the brain had not been autopsied. A thorough review of the relevant testimony refutes Dr. Jain's contention.

¶ 33 The following excerpts are from a sidebar discussion between counsel and the court that took place during Dr. Vey's cross-examination concerning cause of death:

> [Court]: You [Defense Counsel] can say, did you autopsy the brain. . . . Did you autopsy the carotids, but that's as far as it goes.
>
> [Defense Counsel]: Fine. I didn't say I was going to go any further.
>
> [Court]: . . . Absent any other evidence, you're not going to be able to argue to this jury that there's another cause of death or there's a reasonable probability there was another cause of death.

(N.T., 2/16/06, at 176).

> [Court]: What I'm saying is you cannot cross-examine a witness and then interject at the time of your closing argument a conclusion that isn't supported by the evidence in the case from some source. So, in other words, you cannot argue an ultimate cause of death theory unless there's some evidence to support that argument. That's all I'm saying.
>
> [Defense Counsel]: Okay.
>
> [Court]: And as of this point you have no other evidence to support [an alternate cause of death]. But can you chal-

lenge [Dr. Vey's] testimony and his conclusions? Absolutely. And that would include questions dealing with the extent of the autopsy and what organs or vessels or what parts of the body were not autopsied or examined. That's okay.

[Defense Counsel]: And just so I'm clear, are you saying that I can ask [Dr. Vey], if I choose to, Doctor, is there evidence that he had a stroke or there is no evidence that he didn't have a stroke?

[Court]: Yeah, you can ask that.

(N.T., 2/16/06, at 179–80).

¶ 34 Immediately following this sidebar, defense counsel continued his cross-examination of Dr. Vey as follows:

[Defense Counsel]: Doctor, I had asked you whether there was an autopsy of the carotid arteries and you indicated that there was not, correct?

[Dr. Vey]: That's correct.

[Defense Counsel]: There was also no autopsy of the brain, correct?

[Dr. Vey]: That's correct.

[Defense Counsel]: And the only way that you could rule out a stroke in this case would be with an autopsy of the brain, correct?

[Dr. Vey]: That's correct.

(N.T., 2/16/06, at 80).

¶ 35 Thus, contrary to Dr. Jain's contentions, the trial court *did* allow rebuttal of Dr. Vey's testimony with questions as to possible omissions in the autopsy procedure and the resulting implications for interpretation of the autopsy findings. However, the court properly refused to allow defense counsel to argue alternate theories of death for which there was no evidence. We conclude that the trial court properly stated and applied the law and thus did not abuse its discretion.

¶ 36 In Dr. Jain's third evidentiary challenge, he contends that the trial court erred in precluding the testimony of his two cardiology experts, Drs. Garrett and Beller, as to the applicable standard of care. Specifically, these two experts would have testified that, because Decedent had been referred by his family physician to Dr. Jain only for a stress test, the applicable standard of care in this case required *only* that Dr. Jain perform the stress test properly and report the results accurately to the referring physician. In the opinion of Drs. Garrett and Beller, the standard of care did not include a duty to make any recommendations for future treatment, based, *e.g.*, on the cardiologist's knowledge of the potential for false negatives of the tests performed and/or the patient's medical history. Drs. Garrett and Beller analogized the standard of care for a cardiologist who had been asked only to perform a stress test to that of a radiologist asked to perform a specific radiological test. The trial court refused to admit this testimony, concluding that a cardiologist, like any other physician, has an independent duty to the patient that cannot be circumscribed by a referring physician. (*See* N.T., 2/14/06, at 9–10).

■ ¶ 37 It is beyond any question that, in a cognizable medical malpractice claim, the defendant-physician must owe the patient a duty of care. Whether a duty of care exists in any given set of circumstances is a question of law. *See, e.g., Long v. Ostroff*, 854 A.2d 524, 528 (Pa.Super.2004), *appeal denied*, 582 Pa. 700, 871 A.2d 192 (2005) (holding as a matter of law that a general practitioner's duty of care does not prohibit an extramarital affair with a patient's spouse).

■ ¶ 38 Duty is measured against the standard of care appropriate to the training of the physician and the time and place of the treatment. Our Supreme Court has explained the standard of care

appropriate to a non-specialist physician as follows:

> The standard of care required of a physician ... is well-settled.... A physician who is not a specialist is required to possess and employ in the treatment of a patient the skill and knowledge usually possessed by physicians in the same or a similar locality, giving due regard to the advanced state of the profession at the time of the treatment; and in employing the required skill and knowledge he is also required to exercise the care and judgment of a reasonable man.

*Joyce v. Boulevard Physical Therapy & Rehabilitation Center, P.C.*, 694 A.2d 648, 654 (Pa.Super.1997) (quoting *Donaldson v. Maffucci*, 397 Pa. 548, 553, 156 A.2d 835, 838 (1959)). However, this Court has consistently held that a specialist physician is held to a higher standard of care than a general practitioner when the specialist is acting within his or her specialty. *See, e.g., id.; Maurer v. Trustees of the University of Pennsylvania*, 418 Pa.Super. 510, 614 A.2d 754, 758 (1992) (en banc). More specifically, the specialist "is expected to exercise that degree of skill, learning and care normally possessed and exercised by the average physician who devotes special study and attention to the diagnosis and treatment of diseases within the specialty." *Joyce, supra* at 654; *Maurer, supra* at 758 (citation omitted).

■ ¶ 39 Dr. Jain's argument, *i.e.*, that his duty to Decedent was defined by the referral instructions from Decedent's general practitioner, contradicts the clear and precedential statements of law discussed above. As a cardiologist acting within his specialty, Dr. Jain must be held to a higher standard of care than a general practitioner, as a matter of law. Dr. Jain had devoted special study and attention to the diagnosis and treatment of cardiac disease, which includes interpretation of the results of diagnostic tests, with the potential confounding factor of false negative tests, and appreciation for the significance of family medical history to an individual's diagnosis of cardiac disease and subsequent prognosis. Despite these specialized and relevant skills of a cardiologist, Dr. Jain essentially argues that, in many cases, a referring general practitioner should define the standard of care for a cardiologist who is acting within the specialty of cardiology. Dr. Jain's argument contradicts the law of the Commonwealth, and as such, is untenable. Therefore, the trial court acted properly in holding that Dr. Jain could not argue that his standard of care was circumscribed by the referral from Decedent's general practitioner.

■ ¶ 40 In Dr. Jain's fourth and final issue, he alleges that the trial court erred in limiting the testimony of Dr. Beller as to the status of Decedent's left coronary artery three months before his death. In Dr. Beller's report, he speculated that the obstruction in Decedent's coronary artery was not as severe at the time of the stress test as it was three months later at the time of death. Dr. Jain contends that Dr. Beller "should have been permitted to give his opinion regarding the fact that [Decedent] may not have had a subtotal occlusion of the left coronary artery at the time of [the] stress test." (Dr. Jain's Brief at 31). Dr. Jain's allegation is totally lacking in merit for several reasons.

¶ 41 First, even Dr. Beller acknowledged that his opinion regarding the extent of the obstruction was completely speculative. As Dr. Jain acknowledges, the relevant portion of Dr. Beller's report begins "[i]t could be speculated...." (Dr. Jain's Brief at 30). Mere speculation does not constitute evidence and was properly excluded.

¶ 42 Second, that the left coronary artery was in all likelihood *not* totally obstructed three months before Decedent's

death was not disputed. Even Appellant's experts testified that three months prior to Decedent's death the artery was partially, not totally obstructed. However, it was also not disputed that catheterization would have detected a subtotal obstruction in Decedent's coronary artery.

¶ 43 Third, Dr. Beller was indeed allowed to testify in response to a question from Appellant's counsel that he had "no idea of the degree of narrowing" of Decedent's coronary artery three months before his death. (N.T., 2/20/06, at 71). Dr. Jain's final issue is thus wholly devoid of any merit.

¶ 44 In summary, we conclude after careful review that the trial court erred in failing to grant Appellant's post-trial motion for a new trial on all issues. Therefore, we reverse the judgment and grant Appellant a new trial. We also conclude that none of Dr. Jain's issues have merit.

¶ 45 Judgment reversed. New trial granted.

¶ 46 ORIE MELVIN, J. files concurring and dissenting statement.

## CONCURRING AND DISSENTING STATEMENT BY ORIE MELVIN, J.:

¶ 1 I concur in the majority's disposition granting a new trial on the basis that the verdict was against the weight of the evidence. I also agree with the majority's resolution of Dr. Jain's first two issues in his cross-appeal. However, I would find that his third and fourth evidentiary challenges have merit.

¶ 2 There is no dispute that a cardiologist acting within his or her specialty must be held to a higher standard of care than a general practitioner, as a matter of law. *See Maurer, supra.* However, I believe the testimony of cardiology experts Drs. Garrett and Beller should have been permitted in order for Dr. Jain to draw the distinction he wishes to present for the jury between the role of a cardiologist who is asked to perform a stress test as opposed to the role of a cardiologist who is asked to perform a comprehensive cardiology consultation.

¶ 3 I would also find the trial court erred in precluding Dr. Beller from giving his opinion regarding the fact that decedent may not have had a subtotal occlusion of the left coronary at the time of the stress test. Although a review of the expert report clearly reveals that Dr. Beller would have been unable to specifically state the extent of the occlusion present at that time, I believe that he should have been permitted to testify consistent with his report that "[f]alse negative studies are rarely seen in patients with subtotal occlusions of the proximal left coronary artery." Therefore, I would permit Dr. Jain's experts to testify with respect to these matters upon retrial. Accordingly, I respectfully dissent.