J-A23040-20

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| ANTHONY WILSON | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| AUTOZONE STORES, LLC., | : | |
| AUTOZONE, AUTOZONE II., AND | : | |
| AUTOZONE INC. | : | No. 140 EDA 2020 |
| | : | |
| | : | |
| APPEAL OF: AUTOZONE STORES, | : | |
| LLC | | |

Appeal from the Order Entered November 19, 2019
In the Court of Common Pleas of Philadelphia County Civil Division at
No(s):  No. 141000329

BEFORE:  KUNSELMAN, J., NICHOLS, J., and PELLEGRINI, J.*

MEMORANDUM BY PELLEGRINI, J.:  **FILED DECEMBER 02, 2020**

AutoZone Stores, LLC (AutoZone) appeals from the judgment entered following a jury trial in the Court of Common Pleas of Philadelphia County (trial court) in favor of Anthony Wilson (Wilson).  The jury found that AutoZone's negligence caused Wilson to sustain injuries during a fall in oil spilled outside of an AutoZone store and awarded Wilson $432,000 in damages.  We affirm.

**I.**

We glean the following facts from the certified record.  On May 10, 2013, Wilson went to a local AutoZone store to purchase anti-freeze.  As he was

_____

* Retired Senior Judge assigned to the Superior Court.

entering the store, he noticed a "gooey, slippery" substance on his new shoes, which he assumed that he must have stepped in while walking through the parking lot.  N.T., 8/27/19, at 60, 78-79.  He told an AutoZone employee that there was a spill in front of the store and that they should clean it up.  The employee responded, "I just work at AutoZone." *Id.*

Wilson continued shopping in the store for 15 to 30 minutes and then left through the same door he had entered.  He was no longer thinking about the substance he had stepped in and he did not notice it on the ground as he exited the store.  However, as he walked toward his car, he slipped on oil and sustained serious injuries.  There were no cones or tape in the area to alert passers-by to a spill.  Wilson testified that there was oil covering a one-to-two foot area on the curb directly in front of AutoZone where he fell.  While he acknowledged that he noticed the substance on his shoe when he entered the store earlier, he testified that he did not see the oil outside and did not know where the spill was located until after he fell.  *Id.* at 82, 90.

As a result of the fall, he sustained a patellar tendon rupture and medial meniscal tear in his left knee.  He later underwent surgery to repair the injury and physical therapy thereafter.  By the time of trial over six years later, Wilson testified that he had not recovered the full range of motion in his left knee and was no longer able to perform certain physical activities such as running, playing sports or cleaning.  He walks with a limp, is unable to stand for long periods and has difficulty using the stairs.  He testified that he still

experiences severe pain in his knee on a daily basis. Wilson said that he had gout and other problems with his right leg prior to the accident but the issues he now experiences with his left leg only began after his fall at AutoZone.

Wilson introduced testimony from Thomas Balchak, an AutoZone district manager for the store where Wilson was injured, and Steven Cooper, the store manager on the day in question. Balchak testified that AutoZone's store managers are responsible for ensuring that the interior and exterior of the stores are clean, and that AutoZone has procedures for employees to follow if a spill is brought to their attention. Balchak noted that AutoZone's landlord was responsible under the terms of the lease for maintaining the sidewalks and parking lot, but said that AutoZone nevertheless takes responsibility for making sure the exterior of the store is safe and clean for customers. Cooper testified that as the store manager, he ensured that there was no trash or anything that could cause injury in front of the store, but that he was not responsible for the parking lot, curb or outside areas. He said that there was no policy in place related to cleaning the parking lot, but he did instruct his employees to clean any spills that they noticed. Cooper was not working on the day of Wilson's fall. Balchak and Cooper testified that customers could bring oil to AutoZone in their own containers for the store to dispose of properly.

Dr. Norman Stempler testified as an expert on behalf of Wilson through a video deposition and detailed Wilson's injuries resulting from the accident,

his treatment history, and his prognosis for recovery. Dr. Stempler examined Wilson twice for the purposes of his lawsuit. He first examined Wilson approximately three years after his accident and at that time, Wilson was still experiencing pain, loss of motion and difficulty with walking and other movements. He testified that Wilson also had fluid in his knee and it was chronically inflamed. Dr. Stempler testified that Wilson's condition had worsened by 2019, as he had lost more motion in his knee and was continuing to experience pain. Based on this history and Wilson's age, Dr. Stempler opined that his prognosis for a full recovery was poor. He did not believe that Wilson's knee would fully recover and said that Wilson would experience the pain and loss of function for the rest of his life. Dr. Stempler confirmed that Wilson had a history of degenerative joint disease, but said that before the fall, Wilson did not have problems with his left knee to the extent that he did after. He testified that Wilson had been showing signs of recovery in the months immediately after his surgery, but that it was not uncommon for injuries of this type to decline over time.

In its case-in-chief, AutoZone presented a video deposition of Dr. Craig Israelite, who testified as an expert regarding the cause and extent of Wilson's injuries. Dr. Israelite rendered his opinion based on his review of Wilson's medical records. He agreed that Wilson had suffered a left patellar tendon rupture but opined that he had recovered from that injury following surgery. He opined that due to his age and weight, Wilson had some degenerative and

chronic changes to his knees prior to sustaining his injury. Wilson also had a gout condition prior to the accident that could have contributed to his injury. However, Dr. Israelite found that based on the treating physician's notes, Wilson had recovered to full motion, strength and range of activities by approximately six months after his surgery. He noted that Wilson was discharged from physical therapy after the surgery for noncompliance. He did not believe that any ongoing issues Wilson suffered with his left knee were the result of his fall at AutoZone.

Following reception of the evidence, the jury deliberated and returned a verdict. In its initial verdict sheet, the jury determined that AutoZone was negligent and the factual cause of Wilson's injury. The jury also determined that Wilson was negligent but found that he was not the factual cause of his injury. Because it found that Wilson was not the factual cause of the injury, the verdict form instructed the jury to skip the following question, which asked it to apportion the percentage of negligence between the parties. When the jury initially read its verdict in open court, however, the clerk asked the jury about the apportioned negligence, and the jury responded that AutoZone bore 80% of the negligence and Wilson bore 20%. At that juncture, the trial court realized that the jury had not followed the instructions on the form and sent it back to the deliberation room to correct the form. When the jury reentered the courtroom, it again stated that Wilson was not the factual cause of his own injury and followed the instruction to skip the question regarding apportioning

negligence. Finally, the jury awarded Wilson $432,000 in non-economic damages for his injury.

AutoZone filed a timely post-trial motion and brief in support and Wilson filed a response. The trial court denied the motion and AutoZone timely appealed. The trial court and AutoZone have complied with Pa.R.A.P. 1925.

## II.

AutoZone first argues that it is entitled to judgment *non obstante veredicto* (JNOV)[1, 2] because the danger presented by the oil spill in the

_____

[1] We have set forth our scope and standard of review as follows:

> [a] JNOV can be entered upon two bases: (1) where the movant is entitled to judgment as a matter of law; and/or, (2) the evidence was such that no two reasonable minds could disagree that the verdict should have been rendered for the movant. When reviewing a trial court's denial of a motion for JNOV, we must consider all of the evidence admitted to decide if there was sufficient competent evidence to sustain the verdict. In so doing, we must also view this evidence in the light most favorable to the verdict winner, giving the victorious party the benefit of every reasonable inference arising from the evidence and rejecting all unfavorable testimony and inference. Concerning any questions of law, our [standard] of review is [*de novo*]. Concerning questions of credibility and weight accorded the evidence at trial, we will not substitute our judgment for that of the finder of fact. If any basis exists upon which the [fact finder] could have properly made its award, then we must affirm the trial court's denial of the motion for JNOV. A JNOV should be entered only in a clear case.

*Linde v. Linde*, 220 A.3d 1119, 1140 (Pa. Super. 2019) (alterations in original).

[2] AutoZone also raises a challenge to the trial court's denial of its motion for nonsuit. However, "a defendant's presentation of evidence following the

parking lot was known and obvious to Wilson before he entered the store, and he voluntarily chose to encounter the known risk once again as he left. AutoZone cites **Carrender v. Fitterer**, 469 A.2d 120 (Pa. 1983), for the proposition that when a business invitee voluntarily encounters an obvious and avoidable dangerous condition, the possessor of the land is not liable for injuries resulting from that obvious danger and has no duty to warn the invitee of the danger. AutoZone, thus, contends that Wilson assumed the risk of falling in the oil outside of AutoZone because he was aware of the spill and chose to walk through the area when exiting the store.

Wilson and the trial court contend that **Carrender** is inapposite because Wilson did not see the oil spill in the parking lot on the way into the AutoZone, but rather only noticed an oily substance on his shoe after he entered the store. Wilson also contends that he did not see the oil spill on the curb after he left the store until he had already fallen. Because he was not aware of the exact location of the spill prior to his fall, Wilson and the trial court conclude that AutoZone breached its duty to warn or protect Wilson from the spill.

To prove a claim of negligence, a plaintiff must establish "a duty or obligation recognized by law; breach of that duty by the defendant; causal

---

denial of a defendant's motion for nonsuit renders the correctness of that denial a moot issue," and "the denial of a motion for compulsory nonsuit is not appealable." **Williams v. A-Treat Bottling Co., Inc.**, 551 A.2d 297, 299 (Pa. Super. 1988) (citing **Burns v. City of Philadelphia**, 504 A.2d 1321 (Pa. Super. 1986)). Thus, we do not address this issue.

connection between the defendant's breach of that duty and the resulting injury; and actual loss or damage suffered by the complainant." **Reilly v. Tiergarten, Inc.**, 633 A.2d 208, 210 (Pa. Super. 1993). A business such as AutoZone owes the highest duty of care to its business invitees, and it "must protect an invitee not only against known dangers, but also against those which might be discovered with reasonable care." **Gutteridge v. A.P. Green Servs., Inc.**, 804 A.2d 643, 656 (Pa. Super. 2002). AutoZone contends that it is entitled to JNOV because Wilson failed to establish the first element of his claim: that AutoZone had a duty to warn or protect him from the danger presented by the known and obvious oil spill.

Our disposition of this issue depends on a detailed review of Wilson's testimony. Wilson first testified that on the day of his fall, he parked in the parking lot in front of AutoZone and walked into the store. He testified: "As I entered AutoZone, as I walked—as I walked into AutoZone, I walked into the store. I noticed that there was a gooey, slippery substance on my new sneakers." N.T., 8/27/19, at 60. He testified that he immediately told an employee that there was a spill "out there" before continuing to his shopping. *Id.* When Counsel later asked him if he noticed the spill when he was exiting the store, Wilson responded that he did not and that he was no longer thinking about the spill. *Id.* at 63. Describing the fall, he stated "[a]s I was exiting the store, as I was walking from the store, the next thing I know, as I went to step down, I was on the ground." *Id.* at 64. There were no cones or tape

to mark the spill. Wilson confirmed that a photo exhibit of the area outside of AutoZone depicted the portion of the sidewalk where he fell. *Id.* at 65. Later, when asked where he was looking at the time of the fall, Wilson said that he was "looking forward" and "[w]alking directly out of the door to my car." *Id.* at 74.

On cross-examination, AutoZone questioned Wilson regarding whether he saw the oil spill before entering the store:

Q: On the day of the accident you did see an oil spill. Correct?

A: I walked in to enter the store.

Q: So on your way in to the store you saw an oil spill?

A: I walked and entered into the store. I noticed when I got in the oily substance was on my sneaker.

*Id.* at 78-79. He then testified that the spill was on the curb right in front of the store and covered one to two feet in area. *Id.* at 80-81. The following exchange then occurred:

Q: Can you indicate where it is you saw that oil spot on your way in to the store that day?

A: I see nothing. I walked right there. I walked in the AutoZone. As I walked in to the AutoZone, I walked in the door.

Q: Where was the spot that you saw on the curb?

A: As I walked into AutoZone—as I walked into AutoZone, the oily substance was in that zone area, all right there.

Q: So where the split in the concrete is; somewhere around either side of that?

A: Yes, I walked into there.

*Id.* at 82.  Later, AutoZone again asked Wilson if he slipped where he saw the oil spill on his way into the store, and Wilson responded, "[i]n front of the AutoZone.  I didn't know nothing was in there.  As I walked in, like I said before, I noticed a gooey substance was on my sneaker."  *Id.* at 90.

AutoZone then attempted to impeach Wilson with his prior deposition testimony:

> Q: Reading that, does it refresh your recollection that where you fell on the way out is the same place where you had noticed something on your way in?
>
> A: The way I walked in is the way I walked the same way out.
>
> The court: Does that mean yes?
>
> A: Yes.

*Id.* at 91.  AutoZone then reiterated Wilson's prior deposition testimony:  "You were asked, '[w]here you fell, is this the same place where you had noticed something on your way in?'  And your answer was—"  Wilson responded, "Yes."  *Id.* at 91-92.  Wilson then said he did not know whether the spill had been cleaned while he was shopping or whether the spill was still on the ground when he left.  *Id.* at 92.  The only testimony about the appearance of the oil spill was Wilson's description of the one-to-two foot size of the spill; no evidence was admitted as to the color or visibility of the oil spill.

Our review of Wilson's testimony reveals that he repeatedly testified that he did not see the spill on his way into the store and only became aware of the spill when he noticed the oily substance on his shoe.  The exchange

related to Wilson's deposition testimony is the only portion of the testimony where he does not specifically state that he only saw the substance on his shoe after entering the store, and as Wilson argues in his brief, the testimony is far from clear. **See** Wilson's Brief at 11-12 ("[Wilson] may have been merely affirming his testimony that he used the same general path when he exited from the store as he used to walk from his car to AutoZone."). In contrast, whenever he was asked directly whether he saw the spill on his way into the store, Wilson testified that he did not. N.T., 8/27/19, at 78-79, 82, 90. The more oblique statements in Wilson's prior deposition do not establish "beyond peradventure" that Wilson saw the oil spill before he entered the store.

AutoZone relies on **Stewart v. Ray**, 76 A.2d 628 (Pa. 1950), to argue that because cross-examination on Wilson's deposition testimony was the last word regarding when he saw the spill, that version of events should control for the purposes of its JNOV claim. In **Stewart**, our Supreme Court recognized the "settled principle that where a witness has testified to two different versions or has made inconsistent and contradictory statements and is confronted with that contradiction, his final statement is the one which controls." **Id.** at 632. There, the witness provided manifestly contradictory testimony on direct and cross-examination and was subject to lengthy questioning as to which of his statements was correct. **Id.** The **Stewart** court

held that the witness's final statement, which he adhered to through more rigorous examination, would control over his earlier inconsistent one. ***Id.***

However, in ***Girard Trust Corn Exchange Bank v. Philadelphia Trans. Co.***, 190 A.2d 293, 296 (Pa. 1963), the Supreme Court held that the principle in ***Stewart*** only applies in cases where the witness is directly confronted with his contradictions. Where a witness offers inconsistent testimony but is not subject to examination regarding the contradictions, "the case must go to the jury, whose province it is to reconcile conflicting statements, whether of the same or different witnesses, or to draw the line between them and say which shall prevail." ***Id.*** (quoting ***Smith v. Flannery***, 119 A.2d 224, 226 (Pa. 1956)); ***see also Wolansky v. Lawson***, 133 A.2d 843, 844 (Pa. 1957) (holding that the witness's final statement controls if witness gives contradictory testimony and "the conflicts therein are called to his attention and *he is asked and answers which of them is correct*" (emphasis added)).

Here, Wilson was not asked on direct examination whether he saw the oil spill before entering the store, but in his narrative of events testified that he only noticed the substance on his sneaker after entering the store. N.T., 8/27/19, at 60. He then reiterated that version of events multiple times on cross-examination. ***Id.*** at 78-79, 82, 90. The question in Wilson's deposition did not directly ask whether he saw the oil spill on the way into the store. The question could also be interpreted as asking whether Wilson fell in front of the

store in the same area where he noticed the substance on his shoe, prompting Wilson's response that "[t]he way I walked in is the way I walked the same way out." *Id.* at 91. Based on the ambiguities in both the question and response, this exchange did not reveal a contradictory "final statement" that should have controlled for the purposes of JNOV. The trial court correctly concluded that any ambiguities in Wilson's testimony should be left for the jury to resolve and the jury was entitled to conclude that Wilson did not know the exact location of the spill until after his fall.

Viewing the testimony in the light most favorable to Wilson as the verdict winner, *Linde, supra*, we must determine whether Wilson's general knowledge that there was an oil spill in the parking lot obviated AutoZone's duty to him as a business invitee to warn of or protect from that hazard. There was no testimony at trial as to the size of the AutoZone parking lot or the area in front of the store. Wilson was not asked and did not testify regarding how far away he had parked from the entrance to the store. There was also no testimony regarding the color or visibility of the oil spill in relation to the curb or pavement. While we have determined that Wilson only noticed the substance on his shoe after entering AutoZone, the record does not reveal how much area Wilson crossed before entering the store.

AutoZone argues that this case is analogous to *Carrender*, where the plaintiff observed a hazard and chose to encounter it in the defendants' parking lot. In *Carrender*, the plaintiff parked in the defendants' parking lot

in an area that was covered with a thin sheet of ice. *Carrender*, *supra*, at 121. The plaintiff noticed the ice as soon as she opened her car door and testified that she was immediately concerned about the slippery conditions. *Id.* at 121-22. Even though other parking spaces were available and free from ice, the plaintiff chose to walk over the ice to enter the defendants' business. *Id.* When she returned to her vehicle, she slipped on the ice and fractured her hip. *Id.* The plaintiff brought suit claiming that the defendants had been negligent in maintaining their parking lot and won a judgment against the defendants after a jury trial.

Our Supreme Court concluded that the defendants were entitled to JNOV, holding that "[a] possessor of land is not liable to his invitees for physical harm caused to them by any activity or condition on the land whose danger is known or obvious to them, unless the possessor should anticipate the harm despite such knowledge or obviousness." *Id.* at 123 (quoting RESTATEMENT (SECOND) OF TORTS, § 343A). The court went on to note:

> A danger is deemed to be "obvious" when "both the condition and the risk are apparent to and would be recognized by a reasonable man, in the position of the visitor, exercising normal perception, intelligence, and judgment." For a danger to be "known," it must "not only be known to exist, but ... also be recognized that it is dangerous and the probability and gravity of the threatened harm must be appreciated." Although the question of whether a danger was known or obvious is usually a question of fact for the jury, the question may be decided by the court where reasonable minds could not differ as to the conclusion.

*Id.* at 123-24 (cleaned up). Because the plaintiff testified that she observed the ice, recognized the risk it presented, and chose to walk on it regardless,

the defendants owed no duty to warn or protect her from the hazard and were entitled to JNOV.

Here, Wilson's general knowledge that there had been an oil spill somewhere outside of the store 15 to 30 minutes prior to his fall does not establish that the spill was "known and obvious" under the definitions set forth in *Carrender*. Importantly, the result in *Carrender* flowed from the plaintiff's "uncontradicted testimony" that she directly observed the hazardous ice and consciously chose to encounter it. *Id.* at 124. The plaintiff chose to park her car in an area where walking over ice was unavoidable, despite the availability of other clear parking spaces. There was no question for the jury as to when the plaintiff first became aware of the hazard. As discussed *supra*, no such testimony was offered here to establish that the oil spill was "obvious" as defined in *Carrender*. No cones or tape demarcated the area where the spill was located, and there is no evidence of record to establish that the spill was clearly visible to passersby. To the contrary, the only evidence regarding the oil spill was Wilson's testimony that he did not see the spill on his way into the store, apparently stepping into the oil without noticing it. He also did not see the spill as he exited the store, as he was looking forward and walking toward his car.

The evidence also does not demonstrate that the possibility of harm arising from the oil spill was "known" to Wilson in the same manner as the danger was known to the plaintiff in *Carrender*. There, the plaintiff testified

that she was immediately aware of the risks posed by walking on the ice, as she had a prosthetic leg and knew that she would be unable to balance well on the ice. **Carrender, supra**, at 121-22. Knowing this, she chose to park on the sheet of ice and walk over it to enter the defendants' business. Here, Wilson did not know the precise location of the hazard, other than to tell an employee that there was a spill somewhere outside of the store. Wilson walked through the spill once without noticing it or falling, and there was no testimony at trial that Wilson had any subjective reason to believe that he would not be able to navigate safely back to his vehicle. As a result, it is not clear that "the probability and gravity of the threatened harm [was] appreciated" by Wilson before his fall. **Id.** at 123-24 (citation omitted).

Viewed in the light most favorable to Wilson, the evidence and the inferences fairly flowing therefrom established that Wilson did not know the precise location of the oil spill before his fall and did not consciously choose to encounter it when he left the store. Wilson was questioned regarding whether the oil spill was known and obvious to him before his fall, and the evidence did not establish as a matter of law that AutoZone did not owe him a duty of care. Moreover, Wilson's various responses to questioning at trial and at his deposition did not establish beyond peradventure that he knew of the exact location of the oil spill prior to his fall. On these facts, the trial court correctly held that JNOV was not warranted and that the jury should weigh the evidence and determine liability. No relief is due.

## III.

Next, AutoZone asserts that it is entitled to a new trial on the basis that the verdict was against the weight of the evidence.[3] AutoZone reiterates its argument that Wilson's testimony established that he saw the oil spill on his way into the store, well before he fell and sustained his injuries. AutoZone also argues that the jury's responses to the interrogatories on the verdict slip, finding Wilson negligent but not the factual cause of his injuries, are illogical and demonstrate that the jury was confused about the applicable law.[4] It

_____

[3] Our scope and standard of review is as follows:

> [A]ppellate review of a weight claim is a review of the [trial court's] exercise of discretion, not of the underlying question of whether the verdict is against the weight of the evidence. Because the trial judge has had the opportunity to hear and see the evidence presented, an appellate court will give the gravest consideration to the findings and reasons advanced by the trial judge when reviewing a trial court's determination that the verdict is against the weight of the evidence. One of the least assailable reasons for granting or denying a new trial is the lower court's conviction that the verdict was or was not against the weight of the evidence and that a new trial should be granted in the interest of justice.

**Corvin v. Tihansky**, 184 A.3d 986, 992-93 (Pa. Super. 2018) (citation omitted; alterations in original). "On issues of credibility and weight of the evidence, an appellate court defers to the findings of the trial judge, who has had the opportunity to observe the proceedings and the demeanor of the witnesses." **L.F.F. v. P.R.F.**, 828 A.2d 1148, 1152 (Pa. Super. 2003).

[4] AutoZone initially raised its challenge to the revised verdict slip as an independent claim of error, but clarified in its reply brief that the inconsistencies in the verdict slip were further support for its challenge to the weight of the evidence. AutoZone's Brief at 65-66; Reply Brief at 17-20. A

argues that this confusion is further evident from the jury's initial verdict slip that apportioned 20% of the negligence to Wilson despite finding that he was not the factual cause of his injuries.

"An appellant is not entitled to a new trial where the evidence presented was conflicting and the fact-finder could have decided in favor of either party." **Winschel v. Jain**, 925 A.2d 782, 788 (Pa. Super. 2007).

> A new trial based on weight of the evidence issues will not be granted unless the verdict is so contrary to the evidence as to shock one's sense of justice; a mere conflict in testimony will not suffice as grounds for a new trial. Upon review, the test is not whether this Court would have reached the same result on the evidence presented, but, rather, after due consideration of the evidence found credible by the jury, and viewing the evidence in the light most favorable to the verdict winner, whether the court could reasonably have reached its conclusion.

**Id.** (quotations and citations omitted). As long as the record supports the trial court's exercise of discretion in denying a motion for a new trial based on the weight of the evidence, we must affirm. **Corvin v. Tihansky**, 184 A.3d 986, 992-93 (Pa. Super. 2018) (citation omitted).

---

claim that the jury's verdict should not have been entered because it is inconsistent must be raised before the jury is discharged, while a claim that the verdict is against the weight of the evidence may be preserved in a post-trial motion. **See Avery v. Cercone**, 225 A.3d 873, 877-78 (Pa. Super. 2019) (distinguishing between evidentiary weight claims and claims based solely on inconsistency in the verdict). AutoZone did not preserve a claim of error based on inconsistencies in the jury's responses to the interrogatories, but merely relies on these inconsistencies to support its argument that the verdict was against the weight of the evidence.

AutoZone cites **Bostanic v. Barker-Barto**, 936 A.2d 1084 (Pa. Super. 2007), to argue that inconsistencies in a verdict form that render the verdict illogical can render a verdict against the weight of the evidence.[5] There, the jury returned a verdict that the defendant was negligent for her role in a vehicle accident, but that her negligence was not a factual cause of the plaintiff's harm. **Id.** at 1086. The trial court granted the plaintiff's motion for a new trial on the basis that the jury's conclusion was against the weight of the evidence because both parties' medical experts agreed that the accident caused the plaintiff's injury. We affirmed, finding that even though the jury could have concluded that the plaintiff was contributorily negligent in causing the accident, it could not conclude based on the uncontradicted evidence that the defendant did not also bear some causal responsibility for the plaintiff's injury. **Id.** at 1088. This court has similarly held that a verdict awarding no damages for pain and suffering is against the weight of the evidence when medical experts for both parties agreed that the plaintiff sustained injuries in the accident at issue. **See, e.g.**, **Burnhauser v. Bumberger**, 745 A.2d 1256, 1261 (Pa. Super. 2000).

---

[5] AutoZone also cites **Chiaverini v. Sewickley Valley Hosp.**, 598 A.2d 1021 (Pa. Super. 1991), in support of this proposition. However, a new trial was granted in **Chiaverini** on the basis that the trial court abused its discretion in molding the verdict in an attempt to cure inconsistencies, not on the basis that the verdict was against the weight of the evidence. **Id.** at 1023-24. Thus, it is inapplicable here. **See** note 4, **supra**.

We concluded in these cases that the trial court did not abuse its discretion in awarding a new trial when the jury's verdict was plainly in opposition to the evidence that *both* parties had presented at trial. In **Bostanic** and **Burnhauser**, for example, the jury verdicts disregarded key facts that the parties' medical experts had agreed upon. Thus, the verdicts were against the weight of the evidence because the juries' conclusions directly contradicted all evidence presented at trial. While a successful weight claim does not require that *all* evidence support a conclusion contradictory to the jury's verdict, the evidence must be so clearly weighted toward the opposite conclusion that to allow the verdict to stand would "shock one's sense of justice." **Winschel**, *supra*. Mere disagreements between witnesses or inconsistencies in testimony are factual issues for the jury to decide and will not support a claim for a new trial. **Id.**

The jury is entitled to resolve all conflicts in the evidence and make all credibility determinations when the parties are not in agreement as to the relevant facts and neither party's evidence clearly outweighs the other, as was the case here. **Id.** Wilson and AutoZone disputed several relevant facts: whether Wilson saw the oil spill before entering the store, whether Wilson saw the oil spill before his fall, and whether the injuries Wilson suffered were solely caused by the fall or were the result of other health conditions. AutoZone argues, as it did at trial, that a new trial is warranted because the evidence established that Wilson saw the oil spill before he entered the store and should

have been able to avoid the spill while walking to his car. However, as discussed in Section II, **supra**, our review of the trial evidence reveals that Wilson repeatedly denied seeing the oil spill before his fall. AutoZone cross-examined Wilson on this point based on his responses to questions at his earlier deposition.

The jury, as the sole arbiter of the facts, weighed the evidence presented to reach its verdict. To the extent that Wilson's deposition responses differed from his trial testimony, the jury was entitled to resolve all conflicts in the evidence and pass on Wilson's credibility as a witness. In its verdict, the jury credited Wilson's testimony by finding that both Wilson and AutoZone were negligent, but that only AutoZone's negligence was the cause of Wilson's fall. In reviewing a challenge to the weight of the evidence, this court is not permitted to second-guess the jury's credibility and factual determinations. The trial court did not abuse its discretion in denying the motion for a new trial because the evidence presented was not so clearly weighted in favor of AutoZone that the verdict was shocking to the conscience.

AutoZone also argues that the jury's initial responses to the verdict slip indicate that it was confused by the facts or law. When the jury initially returned its verdict, it found that AutoZone was negligent and the factual cause of Wilson's injury. It also found that Wilson was negligent, but

determined that he was not the factual cause of his injury.[6] The next question on the verdict slip asked the jury to apportion fault between the parties only if the jury had already determined that both parties were negligent and the factual cause of the injuries. Even though the verdict slip directed the jury to skip this question because it did not find that Wilson was a factual cause of the injuries, the jury initially responded to the question by apportioning 20% of the negligence to Wilson.

When the jury read this question aloud in open court, the trial court stopped the proceedings and recessed the jury to correct the verdict sheet.[7]

---

[6] A jury is permitted to render a verdict that a party was negligent but that the negligence was not a factual cause of the plaintiff's injury. **See, e.g.**, **Kozier v. Rayner**, 200 A.3d 513, 520-21 (Pa. Super. 2018). This is particularly true when the jury is presented with multiple accounts of the event in question and is required to weigh all of the evidence to determine which version is most credible. **Id.** As long as the jury's verdict is supported by the evidence and "not inherently improbable nor at a variance with admitted or proven fact or with ordinary experience," a new trial is not warranted. **Id.** at 521 (quoting **S.N.T. Industries, Inc. v. Geanopulos**, 525 A.2d 736, 740 (Pa. Super. 1987)). Here, for example, the jury could have concluded that Wilson was negligent in walking through the oil spill on his way into the store, but not negligent when he left the store 15 to 30 minutes later because he had already alerted an employee that there was a spill to be cleaned outside.

[7] As noted *supra*, AutoZone did not object to this procedure at the time. Wilson also did not object to any inconsistency in the verdict sheet initially read by the jury. As a result, no claim for a new trial based on the inconsistency of the verdict was presented to the trial court and none was raised on appeal. However, we note that when a verdict is "inconsistent, irrational, or problematic" and the inconsistency is evident from the "four corners of the verdict slip," the proper remedy is for the trial court, upon objection from a party, to "return that jury to the deliberation room and instruct it to clarify (not reconsider) the verdict." **Avery, supra**, at 877.

When the jury returned, it had completed the verdict sheet in accordance with the instructions and had skipped the question about apportioning negligence. The final verdict form entered on the record stated that AutoZone's negligence alone caused the fall, and there were no inconsistencies in the responses to the questions regarding causation or apportioning negligence. There is no indication in the record that this procedure confused the jury or that it submitted any questions to the trial court after it was instructed to correct the verdict slip. N.T., 8/28/19, at 70-75. We conclude that this claim is meritless and the trial court did not abuse its discretion in denying the motion for a new trial.

**IV.**

Finally, AutoZone argues that it is entitled to remittitur or a new trial to address liability and damages because the jury's award of $432,000 in non-economic damages is excessive, arbitrary, speculative, punitive and unreasonable.[8] AutoZone argues that Wilson's initial treating physician determined that he had responded well to surgery and had recovered almost entirely within a year following the procedure. It also points out that Wilson had a history of gout, was morbidly obese and had suffered injuries to his right knee and tendons in the past. AutoZone argues that Wilson's medical

---

[8] This court will reverse an order denying remittitur only if the trial court abused its discretion or committed an error of law. *Paliometros v. Loyola*, 932 A.2d 128, 134-135 (Pa. Super. 2007); *Smalls v. Pittsburgh-Corning Corp.*, 843 A.2d 410, 414 (Pa. Super. 2004).

expert only examined him for the purposes of litigation and did not adequately consider Wilson's medical history and the notes from his treating physician when he formed his opinion.

Much like a claim challenging the weight of the evidence, when reviewing an order denying remittitur, we must determine whether the damages award "so shocks the sense of justice such that the trial court should have granted remittitur as a matter of law." **Smalls v. Pittsburgh-Corning Corp.**, 843 A.2d 410, 414 (Pa. Super. 2004). "Remittitur is justified only in limited instances [] where the verdict plainly is excessive, exorbitant, and beyond what the evidence warrants . . . or where the verdict resulted from partiality, prejudice, mistake, or corruption." **Id.** (cleaned up). This court must afford deference to the jury's factual determinations and review a request for remittitur "in light of the evidence accepted by the jury." **Id.** (quotations omitted).

"A jury is given wide latitude to fashion a verdict on damages. . . . The large size of a verdict by itself is not evidence of excessiveness." **Farese v. Robinson**, 222 A.3d 1173, 1189-90 (Pa. Super. 2019). In a case involving non-economic damages, the trial court must advise the jury to consider the following factors when fashioning a damages award:

> (1) the age of the plaintiff; (2) the severity of the injuries; (3) whether the injuries are temporary or permanent; (4) the extent to which the injuries affect the ability of the plaintiff to perform basic activities of daily living and other activities in which the plaintiff previously engaged; (5) the duration and nature of medical treatment; (6) the duration and extent of the physical

pain and mental anguish which the plaintiff has experienced in the past and will experience in the future; (7) the health and physical condition of the plaintiff prior to the injuries; and (8) in case of disfigurement, the nature of the disfigurement and the consequences for the plaintiff.

*Id.* at 1190 (quoting Pa.R.C.P. 223.3). Here, the trial court properly instructed the jury to consider these factors when assessing Wilson's non-economic damages. N.T., 8/28/19, at 58-59. The trial court additionally advised the jury that Wilson's life expectancy at the time of his accident was 36 years. *Id.* at 59. Based on all of the evidence admitted at trial, the jury returned a damages award of $432,000.

The jury's award is supported by the record and not excessive, arbitrary or unreasonable in relation to the evidence adduced at trial. It is undisputed that Wilson sustained a patellar tendon rupture and medial meniscal tear in his left knee as a result of the fall at AutoZone. While he underwent surgery and physical therapy to treat the injury, he had not recovered his full range of motion by the time of trial. In addition, he was no longer able to participate in hobbies or physical activities such as running, playing sports or cleaning, and he experiences pain when walking or standing for long periods. He continues to walk with a limp, has difficulty using the stairs, and sometimes has to use the stairs sideways because of the pain in his left knee. He testified that he still experiences severe pain in his knee on a daily basis.

Wilson also presented testimony from Dr. Stempler regarding his prognosis for long-term recovery. At the examination in 2016, Wilson was

still experiencing pain, loss of motion, difficulty with walking and other movements and chronic inflammation in his knee. By the second examination in 2019, Wilson had lost more motion in his knee and still had daily pain in his knee. Dr. Stempler believed that all of Wilson's problems with his left knee stemmed from the fall at AutoZone, as Wilson had never reported any pain or lack of function in that knee prior to the accident. Based on Wilson's history and age, Dr. Stempler did not believe that Wilson would ever fully recover. He opined that the pain and loss of function was likely to persist throughout the rest of Wilson's life. Even though Wilson had been showing signs of recovery after his surgery, Dr. Stempler explained that it was not uncommon for injuries of this type of decline over time.

AutoZone presented expert testimony to the contrary. While Dr. Israelite agreed that Wilson sustained an injury and would have initially experienced pain as a result, he opined that Wilson had recovered fully following his surgery and that any continuing problems Wilson experienced with his knee were the result of unrelated health conditions. Dr. Israelite formed his opinion based on a review of Wilson's medical records, particularly those generated by his treating physician within six months following the surgery, but did not examine Wilson personally. His testimony contradicted the opinion proffered by Dr. Stempler. The jury, as the sole arbiter of the facts, was entitled to resolve the differences in the two experts' testimony and

credit Dr. Stempler's opinion over Dr. Israelite's. We do not disturb this finding on appeal.

In light of the testimony proffered by Wilson and Dr. Stempler, as well as Wilson's life expectancy of 36 years at the time of the accident, the jury concluded that Wilson was entitled to damages to compensate him for the likely permanent loss of function in his knee and the daily pain he continued to experience as a result of AutoZone's negligence. Under these circumstances, the award of $432,000 in compensatory damages was not so clearly excessive as to shock one's sense of justice. Neither remittitur nor a new trial is warranted, and the trial court did not abuse its discretion in denying relief.

Judgment affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 12/2/20